UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>PENNY ANN BRADLEY,<br><br>                  Debtor-in-Possession. | CASE NO. 18-10122-jlg<br><br>CHAPTER 11 |

## MOTION OF NSM82 LLC TO APPOINT A
## CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)

TO THE HONORABLE JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE

      The Motion of NSM82 LLC ("NSM82"), a creditor and party-in-interest, for entry of an

order, substantially in the form attached hereto as **Exhibit A**, appointing a Chapter 11 trustee for

Penny Ann Bradley (the "Debtor") pursuant to 11 U.S.C. § 1104(a) (the "Motion"), respectfully

represents:

## JURSIDICTION

      1.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and

1334.  This is a core proceeding pursuant to 28 U.S.C. §  157(b).

      2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.    The Rule 2004 Subpoena.

3.        NSM82, which was formerly known as 46 East 82nd Street, LLC, owns

investment property located at 46 East 82nd Street, New York, New York (the "Property").  The

Debtor is the former managing member of Norfolk Street Management, LLC ("Norfolk"), which,

in turn, is the manager for NSM82.

4.        As set forth in the *Motion of NSM82 LLC for Entry of an Order Pursuant to Fed.*

*R. Bankr. P. 2004 Authorizing the Issuance of a Subpoena to the Debtor and Compelling the*

*Debtor to Appear for an Examination and Produce Documents* [Dkt. No. 83] (the "Rule 2004

Motion"), NSM82 believes that the Debtor, while she served as managing member of Norfolk,

committed various self-serving and fraudulent acts related to the Property that caused NSM82

substantial damages.  In order to obtain information regarding those acts that the Debtor has

refused to provide and further substantiate its claim in this case, NSM82 sought to compel the

production of documents and the Debtor's deposition through the Rule 2004 Motion.

5.        By Order dated April 8, 2019 [Dkt. No. 89], the Court granted the Rule 2004

Motion.  In furtherance of that Order, NSM82 served the Debtor and her counsel with a

Subpoena (the "Rule 2004 Subpoena") that called for the production of numerous documents and

the scheduling of the Debtor's deposition on May 20, 2019.

6.        On or about April 29, 2019, the Debtor's counsel served NSM82's counsel with

partial responses to the Rule 2004 Subpoena, with a representation that additional responsive

documents would be forthcoming.  Based on that representation, NSM82 agreed to reschedule

the Debtor's deposition for a date after she completes the required document production.  In the

intervening weeks since that initial production, the Debtor's proposed special counsel requested

that NSM82 execute a confidentiality agreement governing the dissemination of information

2

contained in the Debtor's responses to the Rule 2004 Subpoena and a similar subpoena served by

Atlas Union Corp. ("Atlas").  Negotiations regarding the terms of that agreement have continued

between counsel for the Debtor, NSM82, and Atlas.

**B.      The Bistro Shop Judgment and the Debtor's Receipt of Post-Petition Funds.**

7.      According to Schedule B to her Chapter 11 petition, the Debtor holds a 100%

ownership interest in, among other entities, Bistro Shop LLC.  Pursuant to a Decision and Order

entered on March 20, 2018 – i.e., approximately two (2) months after the Debtor filed her

Chapter 11 petition – in a case titled *Bistro Shop, LLC and Penny Bradley vs. N.Y. Park N.*

*Salem, Inc.*, Supreme Court of the State of New York, County of New York, Index No.

110907/2009, Bistro Shop was awarded judgment in the amount of $2,308,539.41 (the "Bistro

Shop Judgment"). (*See* Declaration of Sidhartha Singh attached hereto as **Exhibit B** ("Singh

Dec."), at Exhibit 1.)

8.      Included in the Debtor's partial responses to the Rule 2004 Subpoena are bank

statements for Bistro Shop, LLC's account with JPMorgan Chase Bank, N.A., ending in 9255.

As those statements reflect, Bistro Shop, LLC received $1,860,172.54 on March 28, 2018, and

another $412,524.01 on March 29, 2018. (*See* Singh Dec. at Exhibit 2.)  As those statements

further reflect, beginning immediately after the receipt of those funds – which, not

coincidentally, are almost equal to the amount of the Bistro Shop Judgment (with the difference

likely attributable to post-judgment interest) – Bistro Shop, LLC made several transfers to an

account ending in 6922 that virtually depleted the funds in their entirety.  Given that the Debtor,

after more than 18 months in Chapter 11, has not filed any periodic financial reports pursuant to

Fed. R. Bankr. P. 2015.3 for Bistro Shop, LLC or any of her other closely-held entities, NSM82

and the Debtor's other creditors are left completely in the dark as to what became of that money.

3

C.    **The Debtor is Arrested and Charged with Multiple Counts of, *Inter Alia,*
Residential Mortgage Fraud.**

9.      On July 10, 2019, the Debtor was arrested following an indictment on charges of

Residential Mortgage Fraud in the First Degree, Grand Larceny in the Second Degree, and two

counts of Forgery in the Second Degree and Criminal Possession of Forged Instrument in the

Second Degree.  According to the press release issued by the Manhattan office of the District

Attorney, the Debtor "forged member signatures to illegally obtain millions of dollars."  In

addition, the press release notes, "[a]ccording to the indictment and documents filed in court,

from 2014 to 2016, [the Debtor] violated her duties as the managing member of 46 East 82nd

Street LLC and stole company funds for personal expenses and unrelated business ventures."

Furthermore, the press release states, "[the Debtor] also used company property as collateral to

obtain a loan for unrelated real estate investments, and forged member signatures to refinance

debt encumbering the townhouse." (*See* Singh Dec. at Exhibit 3.)

10.     According to a search on the New York State Unified Court System's online

docket, the Debtor's criminal case has been assigned Index No. 02134-2019.  She apparently has

retained counsel to represent her and is scheduled to appear before the New York Supreme Court

– Criminal Term on September 18, 2019.  No information is provided regarding whether the

Debtor posted bail and, if she did, how she paid for it.  Nor is it clear how the Debtor paid to

retain criminal counsel, what the terms of that attorney's retention are, and whether the Debtor

intends to file an application to retain special counsel pursuant to Section 327(e) of the

Bankruptcy Code.  In any case, given the seriousness of the charges leveled against the Debtor,

which go to the very heart of the Debtor's fiduciary duties as a debtor-in-possession, it is clear

that she cannot remain the steward of her bankruptcy estate.

4

## REQUESTED RELIEF AND BASIS THEREFOR

11.     By the Motion, NSM82 seeks entry of an order appointing a Chapter 11 trustee to

administer the Debtor's estate for the benefit of all creditors, pursuant to 11 U.S.C. § 1104(a).

12.     Section 1104(a) of the Bankruptcy Code provides that:

> At any time after the commencement of the case but before
> confirmation of a plan, on request of a party in interest or the
> United States trustee, and after notice and a hearing, the court shall
> order the appointment of a trustee –
>
> (1) for cause, including fraud, dishonesty, incompetence, or
> gross mismanagement of the affairs of the debtor by current
> management, either before or after the commencement of the case,
> or similar cause, but not including the number of holders of
> securities of the debtor or the amount of assets or liabilities of the
> debtor; or
>
> (2) if such appointment is in the interests of creditors, any
> equity security holders, and other interests of the estate, without
> regard to the number of holders of securities of the debtor or the
> amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a)(1) and (2).

13.     Admittedly, "[t]he appointment of a trustee is an unusual remedy and … must be

supported by clear and convincing evidence." *In re Taub*, 427 B.R. 208, 225 (Bankr. E.D.N.Y.

2010) (citations omitted).   Nevertheless, when examining the "for cause" option under subsection

(a)(1), " a court is given wide latitude in determining whether the challenged conduct rises to the

level of 'cause.'" *In re The 1031 Tax Group, LLC*, 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007).

Indeed, "the grounds for appointing a [Chapter 11] trustee [pursuant to Section 1104(a)(1)] are not

even limited to the derelictions specifically enumerated." *In re V. Savino Oil & Heating Co., Inc.*,

99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).   Moreover, "[o]nce the court makes a finding that cause

exists under § 1104(a)(1), 'there is no discretion; an independent trustee must be appointed.'" *In*

5

*re The 1031 Tax Group, LLC*, 374 B.R. at 86 (quoting *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. at 525).

14.    Notably, "'[t]he clearest examples [where appointment of a trustee is warranted] are those in which the debtor or its managers have engaged in serious fraud or dishonesty, or have grossly mismanaged the business.'" *In re Piedmont Center Investments*, LLC, 2011 WL 5903398, *3 (Bankr. E.D.N.C. September 8, 2011) (quoting 7 *Collier on Bankruptcy* ¶ 1104.2[1] (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. Rev. 2007)).    Accordingly, where a debtor (or its manager) are indicted on charges relating to pre-petition fraud, "the indictments are primae facie evidence of fraud." *Id.* at *4.    *See also In re American Resources, Ltd.*, 54 B.R. 245, 247 (Bankr. D. Haw. 1985) ("the evidence establishes that independent inquiry by the federal grand jury, the State Bank Examiner, and the Federal District Court, has each found substantial basis in the facts to support the concerns expressed by the creditors who seek appointment of a trustee.").

15.    Even if the Court were to require additional facts beyond the Debtor's indictment to support the appointment of a Chapter 11 trustee pursuant to Section 1104(a)(1), the aforementioned receipt of more than $2.2 million into Bistro Shop, LLC's account and immediate depletion thereof in March 2018, which has not been disclosed in any filings by the Debtor in this case, provide ample basis.

16.    Additionally, appointment of a Chapter 11 trustee is warranted under Section 1104(a)(2), as being in the interests of creditors and the estate.    As courts have noted, "the standard for appointment under Section 1104(a)(2) is a flexible one that suggests a balancing of costs and benefits in determining whether the appointment of a trustee is appropriate." *In re Taub*, *supra*, 427 B.R. at 227 (citation omitted).    "Factors to be weighed in determining whether to direct the appointment of a trustee include the debtor's past and present performance and prospects for rehabilitation, the confidence of the business community and creditors in the debtor's

6

management, and the benefits to be derived from the appointment of a trustee balanced against the costs of appointment." *Id.* (citations omitted).

17.     Here, the Debtor has been in Chapter 11 for almost 18 months.  Until just recently, she did not file any monthly operating reports, and, as noted above, she still has not filed any periodic financial reports for any of her closely-owned entities, including Bistro Shop, LLC, which has had more than $2.2 million pass in and out of its account recently without any explanation.  The Debtor has had more than enough time to file a Chapter 11 plan of reorganization but has failed to do so.  Now, given the extent and severity of the charges leveled against her by the Manhattan County District Attorney, the majority of her time and resources will likely be consumed with defending multiple counts of financial fraud.

18.     The Debtor has earned *no* confidence of NSM82 or any other creditor or party-in-interest in this case.  Therefore, the benefits to be derived from appointing an independent fiduciary to maximize the value of the Debtor's assets far outweigh any administrative expense to the estate resulting from the appointment of a trustee.  *See In re Taub*, 427 B.R. at 228 (where the Court directed the appointment of a Chapter 11 trustee under Section 1104(a)(2), based on, *inter alia*, "the Debtor's retention or proposed retention of at least eight counsel…, her failure to comply with court orders…, and the absence of meaningful progress toward the proposal and confirmation of a plan of reorganization.").  Accordingly, the Court should appoint a Chapter 11 trustee pursuant to Section 1104(a)(2) of the Bankruptcy Code.

19.     No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, NSM82 respectfully requests entry of an order granting the relief sought in the Motion and such other relief as the Court deems just and proper.

Dated:      Hackensack, New Jersey
            July 16, 2019

                                    LAW OFFICES OF KENNETH L. BAUM
                                    LLC
                                    Attorneys for NSM82 LLC


                                    By:_____/s/ Kenneth L. Baum_____
                                          Kenneth L. Baum
                                          167 Main Street
                                          Hackensack, New Jersey 07601
                                          (201) 853-3030
                                          (201) 584-0297 Facsimile
                                          kbaum@kenbaumdebtsolutions.com

## EXHIBIT A

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | CASE NO. 18-10122-jlg |
| PENNY ANN BRADLEY, | CHAPTER 11 |
| Debtor-in-Possession. | |

**ORDER APPOINTING CHAPTER 11 TRUSTEE**
**PURSUANT TO 11 U.S.C. § 1104(a)(1) AND (2)**

Upon the Motion, dated July ___, 2019, of NSM82 LLC ("NSM82"), for entry of an

order appointing a Chapter 11 trustee pursuant to 11 U.S.C. § 1104(a) (the "Motion"); and the

Court having considered the Motion and objections thereto, if any; and due notice appearing; and

sufficient cause appearing for the relief sought in the Motion, it is

ORDERED that the United States Trustee appoint a Chapter 11 trustee pursuant to 11

U.S.C. § 1104(a)(1) and (2); and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters

arising from or related to this Order.

Dated: New York, New York
       July ____, 2019

_____
United States Bankruptcy Judge

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | CASE NO. 18-10122-jlg |
| PENNY ANN BRADLEY, | CHAPTER 11 |
| Debtor-in-Possession. | |

**DECLARATION OF SIDHARTHA SINGH IN SUPPORT OF MOTION OF NSM82
LLC TO APPOINT A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)**

SIDHARTHA SINGH, of full age, pursuant to 28 U.S.C. § 1746, hereby declares under
penalty of perjury as follows:

1.      I am a principal of NSM82 LLC ("NSM82"), a creditor and party-in-interest in
the above-referenced Chapter 11 case of Penny Ann Bradley (the "Debtor").  I am familiar with
the facts and circumstances set forth herein and am authorized to make this Declaration in
support of NSM82's motion for an order appointing a Chapter 11 trustee for the Debtor pursuant
to 11 U.S.C. § 1104(a).

2.      Attached hereto as Exhibit 1 is a true copy of a Decision and Order entered on
March 20, 2018, in a case titled *Bistro Shop, LLC and Penny Bradley vs. N.Y. Park N. Salem,
Inc.*, Supreme Court of the State of New York, County of New York, Index No. 110907/2009.

3.      Attached hereto as <u>Exhibit 2</u> are true copies of selected statements for Bistro Shop, LLC's account with JPMorgan Chase Bank, N.A., ending in 9255.

4.      Attached hereto as <u>Exhibit 3</u> is a true copy of a press release issued by the Manhattan office of the District Attorney on July 11, 2019, regarding the Debtor.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 15, 2019.


*/s/ Sidhartha Singh*
Sidhartha Singh

2

# EXHIBIT 1

*with approval of*
*Keith Hammeran Friedman*
*et atty to Judge*
*MAT/JMC*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK – PART 60

PRESENT: Hon. Marcy Friedman, J.S.C.

————————————————————— x

BISTRO SHOP, LLC *and*
*Penny Bradley,*          *Plaintiffs,*          Index No.: 110907/2009

– against –

N.Y. PARK N. SALEM, INC.,          DECISION/ORDER

*Defendant.*

————————————————————— x

This commercial landlord-tenant action is brought by plaintiff tenant Bistro Shop, LLC (Bistro or Tenant) against defendant landlord N.Y. Park N. Salem, Inc. (N.Y. Park or Landlord) for, among other things, rescission of the parties' lease based on breaches of contract. Bistro contends that N.Y. Park breached the lease between the parties when it failed to commence and complete construction work in the leased premises and the building in a timely manner, thereby preventing Bistro from opening a restaurant at the premises. N.Y. Park contends that it performed the construction work with all reasonably possible speed, and that the lengthy delay in the completion of the work was beyond its control.

The action was tried without a jury on June 14, 15, and 16, and continued on August 15, 16, 17, and 18, 2017. Decision was reserved pending a settlement conference and the parties' submissions of proposed findings of fact and conclusions of law. The causes of action on which Bistro seeks judgment are the first cause of action for breach of contract; the second for breach

of the implied covenant of good faith and fair dealing; the third for negligent misrepresentation; and the fourth for rescission.[1]

Defendant N.Y. Park owns real property located at 30-36 East 60th Street in Manhattan (the Building). By Lease dated June 6, 2007 between N.Y. Park as Owner and Bistro as Tenant, Bistro rented portions of the ground floor and cellar of the Building (the Premises), from which it intended to operate a restaurant. The term of the Lease commenced on June 6, 2007 and expired on May 31, 2024. (Lease, at 1 [Pl.'s Exh. 4].) Following the trial of this action, the parties stipulated to terminate the Lease as of December 12, 2017. (NYSCEF No. 104.)

At the time the Lease was executed, as reflected by its terms and as discussed further below, N.Y. Park intended to begin a large construction project that would add several stories to the Building. The Lease provided that some work would be performed inside the Premises, and that delivery of possession to Bistro would not occur before that work was performed.

TERMS OF THE LEASE RELEVANT TO BISTRO'S CLAIMS

The parties agreed in the Lease that N.Y. Park's construction project would be undertaken in two phases. The first phase (the "Owner's Preparatory Work") was to consist of work inside the Premises, described in Article 43-A (A) of the Lease as the construction of an elevator shaft enclosure, a "bracing" tower, and various columns. Designs showing the Owner's Preparatory Work were annexed as Exhibit D to the Lease. The second phase of construction (the "Owner's Work") was to consist of the construction of the additional stories, to be performed outside the Premises. (See generally id., art. 43-A [A].)

---

[1] Bistro does not seek judgment on its fifth cause of action for a declaratory judgment or its sixth cause of action for "severe economic loss" allegedly caused by N.Y. Park "destroy[ing] plaintiff's business." (Compl., ¶ 54.)

Penny Bradley, a principal of Bistro, was originally named as a plaintiff in this lawsuit, but her claims were dismissed by decision and order of this Court (Fried, J.), dated January 7, 2010. (NYSCEF No. 11.)

2

The Lease permitted Bistro to perform certain demolition and other preparatory work necessary for the "build out" of its restaurant at the same time that N.Y. Park performed its Owner's Preparatory Work. More specifically, the parties agreed that, "[d]uring the time that Owner performs Owner's Preparatory Work, Tenant shall have access to the demised premises for the purpose of taking measurements and preparing any necessary paperwork and thereafter for demolition and preparatory work." (Id.) Upon completion of the Owner's Preparatory Work, N.Y. Park was required to "deliver[] possession of the demised premises to Tenant." (Id., art. 40 [F]; see also id., art. 43-A [A].) The parties agreed that, "[u]pon delivery of the demised premises to Tenant, Tenant may commence its work to prepare the demised premises for Tenant's intended purpose, including, plumbing, electrical and HVAC work." (Id., art. 43-A [A].) The Lease expressly contemplated that Bistro would open its restaurant during the Owner's Work phase of construction, after the Owner's Preparatory Work was complete. (Id., art. 43-A [B], [C].)

N.Y. Park agreed to "undertake[] to perform Owner's Preparatory Work with all reasonably possible speed." (Id., art. 43-A [A].) N.Y. Park also agreed that "[a]ny change in Owner's Preparatory Work which materially adversely affects the operation of Tenant's business shall require Tenant's consent." (Id.) With respect to the second phase of construction, N.Y. Park agreed that "[d]uring Owner's Work, Owner shall use best efforts to minimize interference with Tenant's use of the demised premises." (Id., art. 55.)

The Lease contained several provisions concerning Bistro's rights and remedies in the event of construction delays or interference with Bistro's use of the Premises. (See Interim Decision dated Aug. 17, 2017 [Interim Decision] [NYSCEF No. 99].) In Article 40 (F), N.Y. Park agreed that, absent a default, Bistro's rent would be abated beginning three months after the

3

commencement date of the Lease and continuing six months after the date that N.Y. Park

"complete[d] Owner's Preparatory Work . . . and delivere[d] possession of the demised premises

to Tenant." Article 43-A (C) further provided that N.Y. Park would not be liable for any

consequential damages, including lost profits, caused by its interruption of Bistro's business

during the Owner's Work phase. As previously held by this court, the Lease also did not provide

for, and the parties did not contemplate that Bistro would be entitled to recover, lost profits for

delays in the completion of the Owner's Preparatory Work. (Interim Decision, at 8-10.)

Finally, Article 48 (B) of the Lease required Bistro to notify N.Y. Park if Bistro

"desire[d] to assign this Lease or sublet the entire demised premises. . . ." The parties agreed that

any such notice "shall be deemed an irrevocable offer to Owner (i) in the case of an assignment,

to surrender this Lease or (ii) in the case of a subletting, to surrender the space proposed to be

sublet on the date such proposed assignment or subletting is to become effective . . . ."

<u>FINDINGS OF FACT</u>

Based on the credible evidence at trial, the court makes the following findings of fact:[2]

<u>N.Y. Park's Pre-Lease Representations Regarding The Construction Schedule
And MTA Approval</u>

N.Y. Park admitted in its Answer, and the court finds, that in or about May 2007, before

the Lease was executed, N.Y. Park informed Bistro that the construction project required the

approval of the Metropolitan Transit Authority (MTA) because the Building was located near

subway lines. N.Y. Park represented, however, that it had already completed test drilling below

ground to obtain information to be provided to the MTA, and that it had in fact already applied to

the MTA for approval of the project. (Compl., ¶ 11; Answer, ¶ 11.)

---

[2] Testimony in the record which conflicts with these findings of fact, whether or not explicitly mentioned in this decision, has not been credited by the court.

4

Penny Bradley, a principal of Bistro, testified credibly at trial that on multiple occasions

during Lease negotiations, N.Y. Park's architect, Anna Thorsdottir, and its attorney and

corporate officer, George Pavia, represented to Bistro that MTA approval was imminent.

(8/15/17 Tr., at 155-156 [Bradley Direct].) Ms. Bradley and Bistro's architect, Michael Lewis,

also testified credibly that Ms. Thorsdottir and Mr. Pavia repeatedly represented to Bistro that the

Owner's Preparatory Work would be completed within three months of the date on which the

lease was signed. (Id., at 164-166 [Bradley Direct]; 6/15/17 Tr., at 37 [Bradley Direct], 60, 77

[Bradley Cross], 120 [Lewis Direct]; 8/16/17 Tr., at 191 [Bradley Cross].) The court does not

credit contrary testimony from Ms. Thorsdottir, who did not appear to have a strong recollection

of the events at issue in this case. (See Thorsdottir Tr., at 10-12, 15, 17-18, 20-21, 28 [Pl.'s Exh.

AT-1].) Based on Bistro's testimony and the other evidence in the record, the court finds that

Ms. Thorsdottir and Mr. Pavia made the above representations regarding the timing of MTA

approval and the completion of the Owner's Preparatory Work; that they were authorized by

N.Y. Park to communicate with Bistro regarding these timing issues; and that Bistro reasonably

understood them to make these representations on behalf of N.Y. Park.[3] (See also Bistro's First

Notice to Admit & N.Y. Park's Response, ¶¶ 1-2, 17-20 [Pl.'s Exhs. 82].)

Ms. Bradley testified that she relied on N.Y. Park's representations regarding its

timetable for the Owner's Preparatory Work. (See 8/16/17 Tr., at 191 [Bradley Cross].) On

cross-examination, however, she acknowledged that she discussed N.Y. Park's estimates with

Bistro's own architect, Mr. Lewis, and relied on his judgment that the timetable seemed

reasonable. (6/15/17 Tr., at 80-82 [Bradley Cross]; 8/15/17 Tr., at 182-183 [Bradley Cross];

---

[3] These conclusions as to Ms. Thorsdottir's and Mr. Pavia's apparent authority to speak on behalf of N.Y. Park
apply to all timing-related representations by those persons referenced in this decision. The pre-lease
representations discussed herein are considered only in connection with the negligent misrepresentation cause of
action, and not to vary the terms of the Lease.

5

8/16/17 Tr., at 191 [Bradley Cross]; see also 6/15/17 Tr., at 141-142 [Lewis Cross, testifying that he believed Ms. Bradley relied on his advice regarding N.Y. Park's construction].) She further testified that she understood N.Y. Park's three-month timetable for the Owner's Preparatory Work to be the company's "best faith estimate" about when the work would be completed, and knew that other factors could render N.Y. Park's estimate incorrect. (6/15/17 Tr., at 83 [Bradley Cross]; see also id., at 140 [Lewis Cross, testifying that Ms. Thorsdottir always gave her "best understanding" of the facts].)

Bistro acknowledged that it did not retain or ask any advisor or expert other than Mr. Lewis, who Ms. Bradley testified was not experienced in the type of construction being undertaken by N.Y. Park, to opine about how long the Owner's Preparatory Work was likely to take. Bistro's only other attempt to independently verify the information provided by N.Y. Park was to check permits filed on the Department of Buildings website for the Owner's Work, not the Owner's Preparatory Work. (Id., at 79-81 [Bradley Cross].) Thus, although Bistro itself had the opportunity to assess the time it would take to complete the Owner's Preparatory Work, it took only limited steps to do so.

<u>Bistro's Work At The Premises & Other Costs</u>

Bistro paid the first three months' rent for the Premises. (6/14/17 Tr., at 37 [Bradley Direct]; Pl.'s Exh. 6 [Tenant Ledgers and check].) On or about November 1, 2007, a company called Sixpence Developments LLC, of which Ms. Bradley is also a principal, entered into a separate lease with N.Y. Park for office space in the Building, pursuant to which Ms. Bradley paid $77,875 in rent over approximately three years. (Pl.'s Exh. 15 [Sixpence Lease]; 6/14/17 Tr., at 49-50 [Bradley Direct].) The Sixpence lease was entered into so that Ms. Bradley "could oversee the construction of the restaurant." (6/14/17 Tr., at 50 [Bradley Direct].)

6

In 2007 and early 2008, Bistro performed demolition and construction work at the Premises. Bistro's demolition work was performed between June or July and December 2007. (Compl., ¶ 16; Answer, ¶ 16; Pl.'s Exh. 26a [letter dated 12/20/07 from Robert Frankel (counsel for Bistro) to Mr. Pavia].) This work included the removal of existing dividing walls and wall coverings, ceilings, floors, lighting, plumbing, electrical, and HVAC. Bistro also widened or created openings between the basements of 30 and 36 East 60th Street and excavated the basement of 36 East 60th Street, lowering the floor by three feet. (6/14/17 Tr., at 41-47 [Bradley Direct]; 8/16/17 Tr., at 303-305 [Yesmant Direct]; see Pl.'s Exhs. 16a, 17c, 30 [permit documents, demolition plans, and pictures of work].)

The construction work was commenced in November or December of 2007. As part of this construction, Bistro framed ceilings, floors, and walls; installed plumbing, a sump pump, temporary electrical work, and a temporary fire alarm and sprinkler system; and constructed a new stairwell from the ground floor to the cellar. Bistro also "mocked up the entire restaurant," meaning that it built rough versions of every table, chair, bar and work station; constructed prototypes of various fixtures and designs; and performed tests and preparatory work for a complete façade redesign and replacement. (6/14/17 Tr., at 44-47 [Bradley Direct]; 8/16/17 Tr., at 307-311, 319-320 [Yesmant Direct]; see Pl.'s Exhs. 18c, 30 [construction plans and pictures of work].)

The court finds that N.Y. Park was aware of the above work as it was being performed. In advance of the work, Mr. Lewis's office provided plans to N.Y. Park, which approved the plans and signed permit applications necessary for Bistro to perform the work. (6/15/17 Tr., at 122-124 [Lewis Direct]; Thorsdottir Tr., at 163-164 [Pl.'s Exh. AT-1]; Pl.'s Exhs. 18a, 19a, 21a [permit documents].) N.Y. Park gave both verbal and written consent when Bistro asked

7

permission to begin the construction of the restaurant. (See Pl.'s Exhs. 26a, 26c 27a, 27b [email

and letter correspondence between counsel for Bistro and Mr. Pavia].) Ms. Thorsdottir also

attended weekly meetings with Ms. Bradley and Mr. Lewis at the Premises (6/14/17 Tr., at 54

[Bradley Direct]), where approximately 14 to 18 workers were present every day for Bistro's

construction. (8/16/17 Tr., at 313 [Yesmant Direct].) N.Y. Park never asked Bistro to stop any

of its work. (8/17/17 Tr., at 436-437 [Bonecchi Cross, testifying that he never asked Bistro to

stop any of its work, and was not aware of anyone else doing so]; 8/16/17 Tr., at 316 [Yesmant

Direct, same].)

Bistro ceased its work in March 2008 and left the Premises in order to enable N.Y. Park

to perform its Owner's Preparatory Work. (6/14/17 Tr., at 47, 63 [Bradley Direct]; 6/15/17 Tr.,

at 119-120 [Lewis Direct].) In total, Bistro expended $1,215,756.52 in rent, fees, and

preparatory work at the Premises. (See Pl.'s Exhs. 6, 31-41 [invoices and other records].) This

figure consists of all of the amounts listed in paragraph 78 of Bistro's Proposed Findings of Fact

And Conclusions Of Law, with one exception: It does not include the $77,875 paid by Sixpence

Developments, LLC for office space in the Building to oversee construction. Based on N.Y.

Park's signing of permits, verbal and written consent to Bistro's request to begin construction

work, awareness of Bistro's work, and failure to object to such work, the court finds that N.Y.

Park knowingly approved all of Bistro's work at the Premises, regardless of its classification as

demolition or construction work.[4] The court further finds that Bistro's costs were reasonable.

The Owner's Preparatory Work & Owner's Work

---

[4] Of the $1,215,756.52 referenced above, $535,042.72 was paid to Bistro's general contractor, Kenneth Yesmant of
Restaurant Construction Managers. (Pl.'s Exh. 32 [payment records].) Mr. Yesmant testified on cross-examination
that approximately half of this $535,042 charge consisted of demolition costs. (8/16/17 Tr., at 338 [Yesmant
Cross].) In contrast, N.Y. Park's expert on construction costs, Greg Seigworth, testified that he could identify only
$103,000 of the charge as demolition costs based on the evidence presented by Bistro. (8/16/17 Tr., at 360-367
[Seigworth Direct].)

8

Ms. Bradley testified credibly that, at a meeting on October 24, 2007, more than four
months after the commencement of the Lease, Ms. Thorsdottir informed Bistro for the first time
that no permit application had previously been filed by N.Y. Park with the MTA. Ms.
Thorsdottir nonetheless represented that an application would be submitted that week, and that
she expected the Owner's Preparatory Work to be completed in three to four months—i.e., by
approximately March 2008. (8/15/17 Tr., at 157-158 [Bradley Direct]; 8/16/17 Tr., at 199-203
[Bradley Cross]; Pl.'s Exh. 29, at 11 [Mr. Lewis's handwritten meeting notes].)

As of March 2008, however, N.Y. Park still had not obtained approval from the MTA.
To the contrary, on March 7, 2008, the MTA requested structural drawings of the Owner's
Work, which N.Y. Park had not included in its initial submission. (Pl.'s Exh. 50 [letter dated
6/6/08 from Ms. Ennis to Ms. Thorsdottir]; 8/16/17 Tr., at 251-252 [Ennis Direct]; Thorsdottir
Tr., at 32-33 [Pl.'s Exh. AT-1].) By letter dated May 1, 2008, Bistro notified N.Y. Park that it
was in breach of its contractual obligation to perform the Owner's Preparatory Work with all
reasonably possible speed. (Pl.'s Exh. 48a.)

The plans that were the subject of the MTA permit application were designed by Marie
Ennis, N.Y. Park's original structural engineer for the project.[5] Ms. Ennis's plans were designed
so that, after the completion of the Owner's Preparatory Work, the Owner's Work could be
completed without any negative impact on Bistro's construction or the operation of its restaurant.
(See 8/16/17 Tr., at 284 [Ennis Direct].)

In late 2008, with the MTA permit application still pending, N.Y. Park terminated Ms.
Ennis as its structural engineer, withdrew its MTA application, and undertook to redesign the
project. (See 6/14/17 Tr., at 74-75 [Bradley Direct]; Pl.'s Exh. 54 [email correspondence

---

[5] Prior to designing the project, in 2005 and 2006, Ms. Ennis had prepared a feasibility study for the project.
(8/16/17 Tr., at 236-238 [Ennis Direct].)

9

between Ms. Bradley and Ms. Thorsdottir].) Although Mr. Bonecchi testified that his termination of Ms. Ennis was not caused by any "dissatisfaction" with her work, he also testified that he was concerned that Ms. Ennis's plans were "not getting approved and [that] we had wasted a lot of time," and felt that N.Y. Park had to "scrap the plans and go with the new plan" to secure approval of the construction. (8/17/17 Tr., at 448-449 [Bonecchi Cross].)

N.Y. Park hired Joseph Lieber as its new structural engineer. On January 19, 2009, Ms. Bradley and Mr. Lewis attended a meeting with Ms. Thorsdottir and Mr. Lieber and were informed of the redesign of the project. They were told that new structural designs would be prepared by the end of that month.[6] (6/15/17 Tr., at 127, 130-131 [Lewis Direct]; 6/14/17 Tr., at 74-75 [Bradley Direct].) They were also told that the redesigned construction would occur in one phase rather than in two phases. (6/15/17 Tr., at 133 [Lewis Direct].)[7]

Mr. Lieber's designs were submitted to the MTA in the early spring of 2009. Consistent with N.Y. Park's statement to Bistro in January 2009 that the redesigned construction would occur in a single phase, the permit application covered the construction of the entire project, not merely the Owner's Preparatory Work. (8/18/17 Tr., at 517-518 [Lieber Cross].) The application was approved by the MTA on December 4, 2009, and by the Department of Buildings on August 2, 2010. (Pl.'s Exhs. 56b, 60b.) It is undisputed that N.Y. Park finally commenced its Owner's Preparatory Work in late 2010 or early 2011—i.e., more than three years after the Lease was executed. (8/18/17 Tr., at 526 [Lieber Cross]; 6/14/17, at 80 [Bradley Direct].)

---

[6] It appears that, in connection with Mr. Lieber's redesign, the number of stories N.Y. Park planned to construct on top of the Building increased. (See 8/17/17 Tr., at 469-470 [Bonecchi Cross]; 8/18/18 Tr., at 510-512 [Lieber Cross].)

[7] According to Ms. Bradley, Mr. Lewis told her that he thought the redesigned project would take a minimum of one year, but more realistically two, to complete. (See 6/15/17 Tr., at 144-147 [Lewis Cross]; Pl.'s Exh. 55 [c] [Mr. Lewis's typewritten notes of meeting, with Ms. Bradley's commentary].)

10

The parties disagreed at trial as to (i) when the Owner's Preparatory Work was finally completed, and (ii) whether Bistro was offered possession of the Premises at that time. Ms. Bradley testified that she walked through the Premises in 2011 with N.Y. Park's construction manager and saw that the Owner's Preparatory Work had been completed. (6/14/17 Tr., at 80-81 [Bradley Direct]; 6/15/17 Tr., at 68-69 [Bradley Cross].) She testified, however, that Bistro was not offered possession of the Premises at that time. Rather, she testified that she visited the Premises more than 20 times between 2011 and 2016 and saw that the Premises was being used as a staging area for N.Y. Park's completion of the Owner's Work. (6/14/17, at 86, 88-90, 96-97 [Bradley Direct]; 6/15/17 Tr., at 23-24, 40-41 [same].) According to Ms. Bradley, N.Y. Park periodically represented to Bistro during this period that the Premises would be available in nine months, but was never able to keep to those deadlines. (6/15/17 Tr., at 24, 27-28 [Bradley Direct]; see 8/16/17 Tr., at 206 [Bradley Cross].) She testified that possession was first offered to Bistro in December 2016.

In contrast, Mr. Lieber testified that the Owner's Preparatory Work "probably" was completed sometime in 2012. (8/18/17 Tr., at 493, 497 [Lieber Direct], 545-546 [Lieber Redirect].) When N.Y. Park's counsel later asked if it were "possible" that the Owner's Preparatory Work was completed in 2013, Mr. Lieber answered "it's possible." (Id., at 545-546 [Lieber Redirect].) Mr. Bonecchi testified that the work was completed in 2013. (8/17/17 Tr., at 402 [Bonecchi Direct].) Mr. Bonecchi further testified that he met with Ms. Bradley in 2013 to offer the Premises to Bistro, but that Bistro refused to take the Premises until scaffolding necessary to the construction of the additional stories was removed. (Id., at 402-403 [same].)

Ms. Bradley testified on cross-examination that the 2013 meeting referenced by Mr. Bonecchi was just one of the numerous meetings in which N.Y. Park stated that it would deliver

11

possession of the Premises to Bistro within a nine-month period. She acknowledged that she

expressed concern at that time about scaffolding, but denied that she refused to take the space

based on the existence of the scaffolding. (8/16/17 Tr., at 206-208 [Bradley Cross].)

Ms. Bradley's version of events is supported by the undisputed evidence that N.Y. Park

used the Premises between approximately 2011 and 2016 as a staging area for the Owner's

Work. In connection with this use, N.Y. Park constructed offices and bathrooms in the Premises,

and stored equipment there. (See 6/14/17, at 86, 88-90, 96-97 [Bradley Direct]; 6/15/17 Tr., at

23-24, 40-41 [same], 136 [Lewis Direct]; 8/16/17 Tr., at 229-232 [Farrell Direct],[8] 326 [Yesmant

Direct]; Pl.'s Exhs. 74, 76, 79 [pictures of the Premises].)

Although N.Y. Park attempted to justify its continued use of the Premises during this

period by claiming that Bistro refused to take possession of the space until scaffolding was

removed, Mr. Lieber testified that N.Y. Park's continued occupation of the Premises during the

Owner's Work was part of his redesigned construction plan, which contemplated that the

Premises would be used as "the major access point" for construction of the additional stories.

(8/18/17 Tr., at 545-546 [Lieber Redirect].) This testimony was consistent with Mr. Lewis's

testimony that Bistro was told in January 2009 that construction under Mr. Lieber's plan would

occur in a single phase. (See supra, at 10.) Indeed, Mr. Lieber acknowledged that, under this

plan, Bistro could not have entered the Premises to resume the build out of the restaurant

following the completion of the Owner's Preparatory Work. (8/18/17 Tr., at 546 [Lieber

Redirect].) Although he testified that it would have been "[s]tructurally . . . possible" to alter the

construction design to permit Bistro to take over the Premises upon the completion of the

Owner's Preparatory Work, there was no testimony at trial that N.Y. Park ever so much as

---

[8] Mel Farrell was the property manager of the Building during the relevant period. (8/16/17 Tr., at 225.)

12

discussed with Mr. Lieber such an alteration to the design. (See id., at 546-547 [Lieber Redirect], 517-520 [Lieber Cross].) Moreover, Mr. Lieber testified that such an "early release" would not have been possible without approval from the DOB, given N.Y. Park's single-phase permit. (See id., at 517-520 [Lieber Cross].) When asked why he had not filed applications with the MTA and DOB in two phases in the first instance, Mr. Lieber testified credibly that N.Y. Park had never suggested to him that it wanted the project completed in two phases. (Id., at 517-520 [Lieber Cross], 549 [Lieber Recross].)

The court accordingly does not credit Mr. Bonecchi's testimony that N.Y. Park offered to deliver the Premises to Bistro in 2013 and finds, based on Mr. Lieber's credible testimony, that N.Y. Park could not have offered to do so. Mr. Bonecchi's testimony in this regard is also questionable in light of his admission that N.Y. Park never demanded rent from Bistro between 2013 and 2016. (8/16/17 Tr., at 216 [Bonecchi Direct].) Based on the evidence discussed above and the court's assessment of the credibility of both parties' witnesses, and of the strength of their recollections, the court further finds that the Owner's Preparatory Work was completed sometime in late 2011, and that the Premises was not offered to Bistro until December 2016.

Change of the Owner's Preparatory Work & Damage To Bistro's Work

In the course of changing its structural engineer and/or performing the Owner's Preparatory Work, N.Y. Park altered the design of that work in a manner that adversely affected Bistro's planned use of the space. (See Pl.'s Exhs. 57d [plans showing changes from original design].) In place of the structural columns referenced in the Lease, N.Y. Park instead constructed a "complete concrete structure" that was "much wider in size" and "imposed in the lease space much more than had originally been planned," narrowing an already "slim" area in which Bistro had planned to build a walkway between dining rooms on the first floor and

13

obstructing Bistro's ability to deliver hot food from the kitchen in the cellar to the front of the restaurant. (6/14/17 Tr., at 91-92 [Bradley Direct]; 6/15/17 Tr., at 65-66 [same], 138 [Lewis Direct]; 8/16/17 Tr., at 324 [Yesmant Direct].) N.Y. Park also installed a number of large "anchor bolts" in the cellar floor, each of which protruded about 18 inches upward in an area that Bistro had planned to use as a dishwashing room. (6/14/17 Tr., at 92-93 [Bradley Direct]; 6/15/17 Tr., at 65-66 [same]; 8/17/17 Tr., at 454-455 [Bonecchi Cross, admitting that the anchor bolts were not part of the Owner's Preparatory Work, as originally planned].) N.Y. Park never requested Bistro's consent for these changes to the Owner's Preparatory Work. (6/14/17 Tr., at 76, 92-93 [Bradley Direct]; Thorsdottir Tr., at 191 [Pl.'s Exh. AT-1]; 8/17/17 Tr., at 437, 457 [Bonecchi Cross].)

During the period in which N.Y. Park used the Premises as a staging area, N.Y. Park also removed, destroyed, or damaged a significant portion of Bistro's preparatory work. For example, N.Y. Park sealed an opening that had been created by Bistro between the cellars of 30 and 36 East 60th Street; destroyed or badly damaged framing; removed or damaged plumbing piping; and removed most of a "knee wall" constructed by Bistro. (6/14/17 Tr., at 94-96 [Bradley Direct]; Bradley, 6/15/17 Tr., at 39-43 [same], 136-137 [Lewis Direct]; 8/16/17 Tr., at 320-321 [Yesmant Direct]; Pl.'s Exhs. 74, 76, 79 [pictures of the Premises].)

<u>Expert & Professional Testimony At Trial Regarding The Reasonable Duration of the Construction</u>

Bistro's expert, David Montessi, testified credibly at trial that based on industry standards, N.Y. Park's entire project—including both the Owner's Preparatory Work and the Owner's Work—should have taken approximately thirty months to complete. He testified that there should have been a "preconstruction" phase of five or six months, during which time all permits should have been obtained. (6/16/17 Tr., at 91-92, 106-107 [Montessi Direct]; Pl.'s Exh.

14

86 [project schedule].) He further testified that the Owner's Preparatory Work should have been completed in five or six months. (6/16/17 Tr., at 97, 105-107 [same].)

Mr. Montessi's testimony is consistent with and supported by testimony from N.Y. Park. In particular, Mr. Bonecchi testified that N.Y. Park's first construction manager, Builders Group, estimated before the commencement of construction that the entire project would be completed in 36 months. (8/17/17 Tr., at 477-478 [Bonecchi Cross].) Mr. Bonecchi further testified that he was told by a construction manager that the Owner's Preparatory Work would take approximately six months to complete. (Id., at 441-442, 478.) Both Mr. Montessi and Mr. Lieber testified that MTA approval of a project is normally received in less than two months.[9] (6/16/17 Tr., at 120 [Montessi Cross]; 8/18/17 Tr., at 515-516 [Lieber Cross, testifying that MTA approval typically occurs "seamlessly" in "about a month or less"].)

The court does not credit Mr. Lieber's assertion at trial that the "reviewer" at the MTA was difficult and "made it his business to try to stop the project for personal reasons." (8/18/17 Tr., at 498 [Lieber Direct].) Mr. Lieber never elaborated on this vague statement. He testified credibly, however, that N.Y. Park encountered unexpected difficulties during the construction work related to the quality of the rock beneath the building and the strength of the concrete used in the project. (See id., at 493-496 [same].) He also testified that these difficulties collectively delayed the construction by only fifteen months. (Id., at 495-496.)

In summary, the court finds that N.Y. Park did not commence construction of the Owner's Preparatory Work until late 2010 or early 2011, more than three years after the commencement of the Lease. (See supra, at 10-11.) N.Y. Park did not complete the Owner's

---

[9] Mr. Montessi testified that he is currently working on a construction project involving the addition of four stories to an existing building located near a subway line. He testified that the project went through a six-month preconstruction phase, and that the MTA approved the project within sixty days. (6/16/17 Tr., at 120 [Montessi Cross].)

15

Preparatory Work until late 2011, more than four years after the commencement of the Lease.

(Supra, at 13.) It is undisputed that N.Y. Park was still performing Owner's Work in 2016,

almost a decade after the commencement of the Lease.

Expert Testimony Regarding the Value of the Lease

Among other things, Bistro seeks to recover in this action the "excess value" of the Lease

during the period in which Bistro was out of possession. (See infra, at 25-26.) Both parties

presented expert testimony at trial analyzing, based on purportedly comparable rental properties,

the market value of the Lease at various times during the Lease term. The court credits the

testimony of N.Y. Park's expert, Sharon Locatell, that Bistro's valuation of the Lease was

improper because it was not based on sufficiently comparable properties and/or did not make

sufficient adjustments to account for important differences between the Premises and the

comparable properties. (See 8/15/17 Tr., at 41-42, 49 [Guzowski Cross], 114-116, 119 [Locatell

Direct].) The court also credits Ms. Locatell's testimony that Bistro's estimation of leasehold

value was flawed because it was based on a methodology that readjusted every year to reflect the

market value of the Lease in that year, rather than estimating the value of a single, multi-year

lease entered into as of a specific date. (See id., at 35, 112-114 [Locatell Direct].)[10]

CONCLUSIONS OF LAW

Negligent Misrepresentation

A claim for negligent misrepresentation requires the plaintiff to allege: "(1) the existence

of a special or privity-like relationship imposing a duty on the defendant to impart correct

information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on

---

[10] According to Ms. Locatell, this methodology in effect assumed that Bistro would have either entered into a new one-year sublease agreement every single year, or that it would have entered into a multi-year sublease agreement with a provision that the rent each year would adjust to market rate. (See id., at 112.) Bistro did not present any evidence sufficient to justify such an assumption.

16

the information." (See <u>Mandarin Trading Ltd. v Wildenstein</u>, 16 NY3d 173, 180 [2011] [internal

quotation marks and citations omitted]; <u>accord</u> <u>Gomez-Jimenez v New York Law School</u>, 103

AD3d 13, 18 [1st Dept 2012], <u>lv</u> <u>denied</u> 20 NY3d 1093 [2013].)

The court holds that Bistro is not entitled to judgment on its negligent misrepresentation

claim for the following reasons: First, the evidence is insufficient to show that a special or

privity-like relationship ever existed between Bistro and N.Y. Park. It is well settled that a

special relationship exists between "persons who possess unique or specialized expertise, or who

are in a special position of confidence and trust with the injured party such that reliance on the

negligent misrepresentation is justified." (See <u>Mandarin</u>, 16 NY3d at 180 [internal quotation

marks and citation omitted].) The relationship between two entities engaged in an arm's length

business transaction or relationship generally is not sufficient. (See <u>e.g.</u> <u>Cooperative Centrale</u>

<u>Raiffeisen-Boerenleenbank B.A. v Atradius Credit Ins. N.V.</u>, 149 AD3d 416, 416 [1st Dept

2017], <u>lv</u> <u>denied</u> 29 NY3d 914; <u>Norddeutsche Landesbank Girozentrale v Tilton</u>, 149 AD3d 152,

162 [1st Dept 2017]; <u>Basis Pac-Rim Opp. Fund v TCW Asset Mgt. Co.</u>, 124 AD3d 538, 539 [1st

Dept 2015]; <u>MBIA Ins. Corp. v Countrywide Home Loans, Inc.</u>, 87 AD3d 287, 296-297 [1st

Dept 2011].)

With one exception discussed further below, the misrepresentations proven by Bistro at

trial relate to N.Y. Park's estimation of the time it would take to secure MTA approval of the

construction project and to complete the Owner's Preparatory Work. Bistro was at all times

managed primarily by Ms. Bradley, a sophisticated business person, and never had more than an

arm's length business relationship with N.Y. Park. Bistro was also represented throughout the

relevant period by counsel and by architects and construction professionals. Neither party had

any special expertise with respect to the type of construction performed by N.Y. Park in this

17

case. Nor was an accurate estimation of the length of time it would take N.Y. Park to obtain

approval from the MTA and complete the Owner's Preparatory Work a matter within the special

or superior knowledge of N.Y. Park.[11]

       Second, New York law is clear that a party's prediction or expectation of future events

cannot give rise to a fraud or negligent misrepresentation claim. (See e.g. Board of Mgrs. of

Waverly Place Condominium v KMG Waverly, LLC, 129 AD3d 549, 550 [1st Dept 2015]

[holding that descriptions of condominium property during early stages of construction "were

predictions of future events and, therefore, cannot sustain an action for fraud"]; Hefter v Citi

Habitats, Inc., 121 AD3d 408, 409 [1st Dept 2014] [holding that defendant broker's estimate as

to a future increase in maintenance charges was merely a statement of prediction or expectation,

and therefore not actionable as fraud or negligent misrepresentation].) The court has found,

based on Ms. Bradley's forthright testimony, that she (and thus Bistro) understood N.Y. Park's

representations regarding the construction timetable to represent no more than a "best faith

estimate." (See 6/15/17 Tr., at 83 [Bradley Cross].)

       Third, the evidence is insufficient to show that Bistro actually and justifiably relied on

N.Y. Park's misrepresentations. Ms. Bradley testified that she discussed N.Y. Park's estimates

with Bistro's architect, Mr. Lewis, and relied upon his judgment that the timetable seemed

reasonable. As the court found above, Bistro did not seek any other independent opinion on how

long the Owner's Preparatory Work was likely to take. (Supra, at 5-6.) To the extent that Bistro

---

[11] This is not a case like Phoenix Garden Rest. v Chu (245 AD2d 164, 166 [1st Dept 1997]), in which the Appellate Division upheld a negligent misrepresentation claim brought by a plaintiff-tenant restaurant against a landlord, among other defendants, based on the defendants' alleged "failure to disclose, at the time the [] lease was executed, that they were proceeding with excavation work under the demised premises without having made the requisite filings or securing the proper underpinnings, although they had previously been apprised of the need for both." Bistro's negligent misrepresentation claim here is not based on representations about the type of work being performed by N.Y. Park or whether that work was being performed safely or in accordance with applicable law. As noted, it is based on misrepresentations about the amount of time it would likely take to complete the work and to obtain required approvals—matters which cannot be said to be within N.Y. Park's special or superior knowledge.

18

seeks to base its negligent misrepresentation claim on estimates made by N.Y. Park in the years after the Lease was signed, Ms. Bradley also testified at trial that, given N.Y. Park's history of not meeting deadlines, there were "many times" when she was "very skeptical" of those representations. (6/15/17 Tr., at 78 [Bradley Cross].)

The only misrepresentation proven at trial that arguably was within N.Y. Park's special or superior knowledge, that did not constitute a prediction or expectation of future events, and on which Bistro may have justifiably relied, was Bistro's representation in or about May 2007 that it had already submitted an application to the MTA for approval of its construction work. This court has found that N.Y. Park did not in fact apply to the MTA for approval of its work until October 2007. (See supra, at 9.) This misrepresentation does not, however, entitle Bistro to judgment on the negligent misrepresentation claim, as there was no evidence that the May 2007 misrepresentation, standing alone, caused Bistro any damages.[12] Ms. Bradley testified at trial that Bistro could have accommodated N.Y. Park's timetable "sliding" as much as six months. (8/15/17 Tr., at 182 [Bradley Cross].) More important, there was no evidence that the money expended by Bistro in rent and construction costs in 2007-2008 was paid in reliance on this May 2007 representation. Bistro in fact discovered the misrepresentation in October 2007, before a significant portion of those costs had been expended, and did not cease its work until March 2008, when it vacated the Premises to enable N.Y. Park to perform its Owner's Preparatory Work. (Supra, at 8.) Judgment on the third cause of action for negligent misrepresentation claim will therefore be denied.

Breach Of Contract/Rescission

---

[12] This court previously held that Bistro cannot recover lost profits damages on its negligent misrepresentation claim. (Interim Decision, at 10-11.)

19

Bistro's first cause of action is for breach of contract, and seeks to recover damages.

(Compl., ¶¶ 37-38.) The fourth cause of action is also based on N.Y. Park's breaches of contract,

but seeks rescission of the Lease. (Id., ¶¶ 47-49.) At the trial, Bistro sought the recovery of all

amounts paid by Bistro in connection with the Lease—the economic equivalent of rescission.

(See Symphony Space, Inc. v Pergola Props., Inc., 214 AD2d 66, 80 [1st Dept 1995] [holding

that the effect of rescission is "to declare the contract void from its inception and to put or restore

the parties to status quo" (internal quotation marks and citation omitted)], affd 88 NY2d 466

[1996]; Schwartz v National Computer Corp., 42 AD2d 123, 125 [1st Dept 1973] [same]; Lenel

Sys. Intl., Inc. v Smith, 106 AD3d 1536, 1537-1538 [4th Dept 2013] [same]; 22A NY Jur2d

Contracts, § 483 [same].) The parties also agreed, following the trial, to terminate the Lease

based on the fact that "the Plaintiff's complaint here seeks, inter alia, judgment rescinding the

lease." (Stipulation dated 12/12/17, second Whereas Clause [NYSCEF No. 104].) The court

accordingly deems Bistro to have elected the remedy of rescission.[13]

Based on the credible testimony and other evidence, the court holds that N.Y. Park

breached numerous provisions of the Lease. In particular, the court holds that N.Y. Park

breached its obligation to "undertake[] to perform Owner's Preparatory Work with all reasonably

possible speed." (Lease, art. 43-A [A].) N.Y. Park's breach of this obligation began with its

---

[13] N.Y. Park does not contend that Bistro failed to timely elect rescission. It is noted that Bistro filed this action in 2009 asserting causes of action, among others, for rescission of the Lease. The record shows that, for most of this litigation, both parties requested that the case be held in abeyance pending settlement discussions and the continuation of construction at the Building. (See e.g. Ltr. from Jonathan Selva [Counsel for N.Y. Park], dated Mar. 30, 2012, so-ordered Apr. 4, 2012 [NYSCEF No. 22] [requesting that the court hold the case in abeyance to allow settlement discussions to proceed]; Order of Reference to ADR, dated Mar. 15, 2013 [NYSCEF No. 24]; Compliance Conference Order, dated Dec. 3, 2013 [NYSCEF No. 28] [providing that "[t]he court is informed that the parties are settling"].) N.Y. Park did not seek rent from Bistro or seek judicial enforcement of the Lease until the eve of trial. (See Order to Show Cause, signed Jan. 26, 2017 [NYSCEF No. 80].)

failure to submit a permit application to the MTA until October 2007, more than four months following the execution of the Lease.[14]

N.Y. Park also, to a far more significant extent, breached its duty to act with "all reasonably possible speed" when it failed from October 2007 until December 2009—i.e., for more than a two-year period—to submit satisfactory plans to the MTA and to obtain that agency's approval of the Owner's Preparatory Work. N.Y. Park did not offer any credible explanation at trial for this two-year delay in obtaining MTA approval. (See supra, at 9-10.) To the extent that it is N.Y. Park's position that its decision to "scrap" Ms. Ennis's initial MTA application and to completely redesign the project evidences N.Y. Park's reasonable diligence and good faith efforts to complete the project, the court finds that position unpersuasive. A complete redesign of the project would not have made sense unless there were serious problems with N.Y. Park's initial MTA application, or unless N.Y. Park had a belated change of heart concerning the construction design, necessitating a change in the application. As noted above, the court also does not find persuasive Mr. Lieber's vague testimony that the reviewer at the MTA had personal issues with N.Y. Park's project. (Supra, at 15.) The two-year delay in obtaining MTA approval vastly exceeded the sixty-day approval period that multiple witnesses at trial testified was normal and reasonable. (Id.) Under these circumstances, Bistro has met its

---

[14] Although four months may not, under normal circumstances, constitute an unreasonable period of time in which to prepare and submit a permit application for a large construction project, it was unreasonable here. N.Y. Park admitted in its Answer that it told Bistro in May 2007 that it had already completed all test drilling for the application and had in fact already applied to the MTA for approval earlier that year. (Supra, at 4-5.) Mr. Bonecchi's testimony at trial that N.Y. Park acted diligently to prepare its application between June and October 2007 is inconsistent with those prior representations, and was in any event conclusory and unpersuasive. Moreover, although N.Y. Park's delay in applying for a permit may not, on its own, have caused Bistro any damages (supra at 19-20), it contributed to the significant overall delay in the completion of the Owner's Preparatory Work, and thus is properly considered in analyzing whether N.Y. Park acted with "all reasonably possible speed" in performing that work.

burden to show that N.Y. Park breached its obligation to undertake to perform the Owner's

Preparatory Work with all reasonably possible speed.

In holding that N.Y. Park breached the Lease by failing to apply for and obtain MTA

approval of the Owner's Preparatory Work in a timely manner, the court rejects N.Y. Park's

contention that "Bistro had no recourse if N.Y. Park took years to begin the Owner's Preparatory

Work," and that "it is only the duration from start to completion of the three enumerated

categories that comprise the defined term 'Owner's Preparatory Work' that must be done [sic]

with all reasonably possible speed." (See N.Y. Park's Findings Of Fact & Conclusions Of Law,

at 1.) It cannot be seriously disputed that N.Y. Park's obligation to "undertake[] to perform

Owner's Preparatory Work with all reasonably possible speed" (Lease, art. 43-A [A]) necessarily

included an obligation to commence that work in a timely manner. To hold otherwise would

lead to the commercially absurd result of allowing N.Y. Park to delay delivery of possession of

the Premises to Bistro indefinitely, simply by refusing to commence the Owner's Preparatory

Work.

The court further holds that N.Y. Park breached its obligation to deliver the Premises to

Bistro following the completion of the Owner's Preparatory Work, which, as found above,

occurred in late 2011. Instead of delivering the Premises to Bistro, N.Y. Park occupied the

Premises itself, turning it into a staging area for the Owner's Work and damaging much of

Bistro's previously approved preparatory work in the process. The Premises was not offered to

Bistro until December 2016, approximately five years after the Owner's Preparatory Work was

completed. (Supra, at 11-13.) Although, as discussed above, Mr. Lieber testified credibly that

problems related to the quality of the rock beneath the building and the strength of the concrete

used in the project delayed the completion of construction by approximately fifteen months

(supra, at 15), N.Y. Park's failure to deliver possession of the Premises to Bistro for five years was not credibly explained, and cannot be seen as reasonable.

N.Y. Park's failure to deliver the Premises to Bistro for five years following the commencement of the Owner's Work was also a breach of its obligation, "[d]uring Owner's Work," to "use best efforts to minimize interference with Tenant's use of the demised premises." (Lease, art. 55 [A].)

Finally, the court holds that N.Y. Park breached its obligation to obtain Bistro's consent before making "[a]ny change in Owner's Preparatory Work which materially adversely affects the operation of Tenant's business." (Id., art. 43-A [A].) Contrary to N.Y. Park's contention, the court holds that Mr. Lieber's redesign of the project included changes to the Owner's Preparatory Work that materially adversely affected Bistro's planned use of the space. Those changes included Mr. Lieber's decision to narrow an already slim hallway between dining rooms, through which food was to have been delivered, and to install obstructive anchor bolts in the area of the cellar that Bistro planned to use as a dishwashing room. (Supra, at 13-14.)

It has been long settled that rescission for a breach of contract is an extraordinary remedy that is generally appropriate only "for such [breaches] as are material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." (Callanan v Keeseville. Ausable Chasm & Lake Champlain R.R. Co., 199 NY 268, 284 [1910]; Jacobs Private Equity, LLC v 450 Park LLC, 22 AD3d 347, 347 [1st Dept 2005], lv denied 6 NY3d 703 [2006]; RR Chester. LLC v Arlington Bldg. Corp., 22 AD3d 652, 654 [2d Dept 2005]; Lenel Sys. Intl., Inc., 106 AD3d at 1538; 28 NY Prac., Contract Law, § 12:7.) "'It is not permitted for a slight, casual, or technical breach . . . .'" (RR Chester. LLC, 22 AD3d at 654, quoting Callanan, 199 NY at 284.) Rather, rescission is permitted for a breach of

23

an obligation "'of such nature and such importance that the contract would not have been made

without it.'" (See Helprin v Harcourt, Inc., 277 F Supp 2d 327, 339 [SD NY 2003] [applying

New York law and quoting Richard A. Lord, Williston on Contracts, § 68:2, at 42 [4th ed

2003)].) Rescission of a contract is also "permitted for failure of consideration, fraud in making

the contract, for inability to perform it after it is made, [and] for repudiation of the contract or an

essential part thereof . . . ." (Callanan, 199 NY at 284; Sciuto v Iannucci Food Corp., 219 AD2d

635, 635 [2d Dept 1995] [holding that "[f]ailure of consideration gives an aggrieved party the

right to rescind a contract"]; 28 NY Prac., Contract Law, § 12:3 [same].)

      N.Y. Park's breaches of contract in this case left Bistro without a usable rental space for

almost a decade; altered the design and flow of the space in a manner that materially affected

Bistro's planned use; and rendered worthless Bistro's significant expenditures in preparatory

work. These breaches were of a substantial and fundamental nature. With the exception of the

rent for the first three months, paid by Bistro at the start of the term, neither party received any

consideration for nine and a half years—approximately 57% of the 17-year lease term. The court

finds that Bistro, as a reasonable commercial actor, would never have agreed to enter the Lease

had it known at the outset that it would not have possession of the Premises for such an extended

period of time.

      Under these circumstances, rescission is appropriate. To restore Bistro to the position it

held at the start of its contractual relationship with N.Y. Park, the court will order N.Y. Park to

pay Bistro the sum of $1,215,756.52, representing all rent, fees, and preparatory costs expended

by Bistro in connection with the Lease. (See Mr. Ham, Inc. v Perlbinder Holdings, LLC, 116

AD3d 577, 578 [1st Dept 2014].)[15] The court declines to deduct from this sum the cost of any

_____

[15] In Mr. Ham, Inc., the Appellate Division affirmed a trial court judgment rescinding a commercial lease and
ordering the return of tenant's security deposit and advance rent payment, based on its holding "that the owner's

24

preparatory work performed by Bistro before the execution of the Lease. It is apparent from the record that such work was performed in reasonable reliance upon the formalization of the parties' relationship in the Lease. N.Y. Park cites no authority that recovery of such amounts would be improper under the circumstances of this case. The court further rejects N.Y. Park's contention that unpaid rent should be deducted from the sums awarded to Bistro. Such a deduction would be inconsistent with the remedy of rescission. (See Rasch, 1 N.Y. Landlord & Tenant Inc. Summary Proc., § 2:11 [5th ed] [stating that rescission based on fraudulent misrepresentation relieves a tenant of any obligation to pay rent accruing after rescission and permits the tenant to "recover such moneys as he may have paid under the lease, such as deposit moneys, rents, and the like . . . ."].)

Bistro is not, however, entitled to recover the $77,875 paid by Sixpence Developments, LLC for office space at the Building to oversee construction. Bistro and Sixpence Developments, LLC are separate legal entities, and Bistro fails to establish that it has any standing to recover amounts expended by the latter company.

Bistro is also not entitled to recover any "excess value of its leasehold interest." (See Pl.'s Proposed Findings Of Fact & Conclusions Of Law, ¶ 106.) As an initial matter, any recovery of "excess value" would be fundamentally inconsistent with rescission. Rescission, as previously noted, aims to restore each party to the position that it occupied before the contractual relationship, as if the contract had never been entered. If the parties here had never entered into the Lease, the Lease would not exist and would have no "excess value."

---

unanticipated renovation of the premises, including the removal of an existing kitchen and equipment, deprived plaintiff commercial tenant of its consideration and frustrated its purpose." (116 AD3d at 578.) The Court further held that "[r]escission was properly awarded because damages to allow the tenant to restore the premises would have been an insufficient remedy in light of the interminable renovations that continued to delay its ability to open for business." (116 AD3d at 578.)

25

Even if Bistro had not elected rescission, an award of "excess value" would not be appropriate for two reasons. First, the "excess value" measure of damages articulated by Bistro is a form of consequential damages similar to lost profits. It is the amount Bistro hypothetically could have profited from the Lease had it sublet or assigned the Lease to a third party. For the same reasons that Bistro cannot recover lost profits damages, it cannot recover "excess value" damages. These forms of consequential damages were not provided for in the Lease and were not within the reasonable contemplation of the parties at the time the Lease was entered. (See Interim Decision, at 8-10.)

Second, Bistro did not proffer a reliable methodology for assessing the value that Bistro could have derived from the Lease. Article 48 (b) of the Lease provided that notice by Bistro of its intent to sublet or assign the Lease to a third party would be deemed an irrevocable offer to N.Y. Park to surrender the Premises. Bistro's contention that it could have avoided this provision by transferring 49.9% of the Membership Interest in Bistro to a third party interested in taking over the space (see Pl.'s Findings Of Fact & Conclusions Of Law, ¶ 87) is too speculative to support an award of "excess value" damages. Moreover, Bistro did not present any evidence as to the profit, if any, it could have earned from such a transaction. Instead, Bistro focused on the profit it could have earned from a traditional sublease or assignment. No showing was made that these types of transactions are equivalent. Finally, even if Bistro could have extracted "excess value" from the Lease, the court credits the testimony of N.Y. Park's expert, Ms. Locatell, that Bistro's expert's methodology did not make proper adjustments to comparable properties and was based on unjustifiable assumptions about the nature of the subleases Bistro would enter. (See supra, at 16.)

26

The court further rejects Bistro's claim for punitive damages. Such damages are "available only in those limited circumstances where it is necessary to deter defendant and others like it from engaging in conduct that may be characterized as 'gross' and 'morally reprehensible,' and of 'such wanton dishonesty as to imply a criminal indifference to civil obligations.'" (New York Univ. v Continental Ins. Co., 87 NY2d 308, 315 [1995] [citations omitted].) Moreover, where punitive damages are sought for a breach of contract, the defendant's conduct must be actionable as an independent tort. The tortious conduct must be egregious, and must not only be directed at the plaintiff, but must be part of a pattern directed at the public generally. (Id., at 316.) Those requirements are not met here. Bistro has never claimed that N.Y. Park engaged in fraud, i.e., intentional misrepresentation. The evidence at trial established that N.Y. Park's breaches were the product of negligence and/or business decisions, not malice toward Bistro. Moreover, no showing was made of a pattern directed at the public. Under these circumstances, Bistro is not entitled to recover punitive damages. (See Mosaic Caribe, Ltd. v All Settled Group, Inc., 117 AD3d 421, 423 [1st Dept 2014]; see also Nutri Cheese & Foods, Inc. v M. Slavin & Sons, Ltd., 184 AD2d 330, 330 [1st Dept 1992].)

Bistro's Remaining Causes of Action

The first cause of action, which seeks damages for breach of contract, and the second cause of action, which seeks damages for breach of the implied covenant of good faith and fair dealing, seek a remedy inconsistent with rescission. The first and second causes of action will therefore be dismissed.

Interest

Rescission is an equitable remedy. (Mercantile & Gen. Reinsurance Co., PLC v Colonial Assur. Co., 82 NY2d 248, 251 [1993], rearg denied 82 NY2d 917 [1994].) Recovery of interest

is therefore a matter within the court's discretion. (See CPLR 5001.) It is well settled that "[t]he purpose of prejudgment interest is to compensate parties for the loss of the use of money they were entitled to receive, taking into account the 'time value' of money." (See Kassis v Teachers' Ins. & Annuity Assn., 13 AD3d 165, 165 [1st Dept 2004]; Mosesson v 288/98 West End Tenants Corp., 294 AD2d 283, 284 [1st Dept 2002] [same].) The credible evidence at trial showed that Bistro stopped its work at the Premises in March 2008 in order to enable N.Y. Park to perform its Owner's Preparatory Work, and that Bistro had incurred the vast majority of its expenses by that time. (Supra, at 8.) The court accordingly holds that that prejudgment interest should be awarded at the statutory rate of nine percent from March 31, 2008.[16]

In awarding prejudgment interest, the court rejects N.Y. Park's contention that interest should be reduced based on Bistro's alleged failure to diligently prosecute this action. As discussed earlier in this decision (supra, at 20 n 13), both parties repeatedly asked the court to hold this action in abeyance while the parties engaged in extended settlement discussions and proceeded with the construction work. Moreover, N.Y. Park did not complete its construction or offer possession of the Premises to Bistro until almost a decade after the Lease was signed. During all of that extended period, Bistro has been deprived the benefit of the funds it wasted in its expectation that N.Y. Park would honor its contractual bargain or that the parties could reach an amicable solution to their dispute. (Compare Greenpoint Mtge. Corp. v Lamberti, 155 AD3d 1004 [2d Dept 2017]; Dayan v York, 51 AD3d 964 [2d Dept 2008], lv dismissed 12 NY3d 839 [2009].)[17]

---

[16] As the exact date in March 2008 on which Bistro stopped its work was not the subject of testimony, the last day in March will be used as the start date for interest.

[17] There is also no basis on which to award compound interest.

28

It is accordingly hereby ORDERED, ADJUDGED and DECREED that plaintiff Bistro

Shop, LLC (A) shall have judgment on the fourth cause of action, for rescission, against defendant

N.Y. Park N. (B) Salem, Inc., and shall recover against said defendant in the amount of

$1,215,756.52, together with interest at the statutory rate from March 31, 2008, as computed by

*of $ 1,091,482.99*

the Clerk, plus costs and disbursements to be taxed by the Clerk upon submission of an

*of $ 1,300.00, for a Total of $ 2,308,539.41,*

appropriate bill of costs; and it is further

ORDERED, ADJUDGED, and DECREED that the Lease, dated June 6, 2007, between

Bistro Shop, LLC as Tenant and N.Y. Park N. Salem, Inc. as Owner, is hereby rescinded; and it

is further

ORDERED, ADJUDGED and DECREED that the first cause of action (for breach of

contract), the second cause of action (for breach of the implied covenant of good faith and fair

dealing), the third cause of action (for negligent misrepresentation), the fifth cause of action (for

declaratory judgment), and the sixth cause of action (for "severe economic loss"), are dismissed

with prejudice.

Dated: New York, New York
       March 14, 2018

*Marcy Friedman*
MARCY FRIEDMAN, J.S.C.

FILED

MAR 20 2018

COUNTY CLERK'S OFFICE
NEW YORK

*h. A. T*

CLERK

29

(A) 30 East 60th St, NY, NY 10022
(B) 419 Park Ave So, NY NY 10016
29 of 34

I HEREBY CERTIFY THAT I HAVE
ADJUSTED THIS BILL OF COSTS AT
$ _____
        1300.00

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MAR 20 2018

M A T

CLERK

-----------------------------------------------------------x

BISTRO SHOP, LLC,

                              Plaintiff,                    Index No. 110907/09

           -against-                                       **BILL OF COSTS OF PLAINTIFF**

N.Y. PARK N. SALEM INC.,

                              Defendant.

-----------------------------------------------------------x

Costs by Statute:

    Before Note of Issue CPLR § 8201(1) .................................................$200.00
    After Note of Issue CPLR § 8201(2) ...................................................$200.00
    Trial of Issue CPLR § 8201(3)(Inquest) ............................................$300.00
    Allowance by Statute CPLR § 8202(a)(b) ..........................................$
    Additional Allowance CPLR § 8302(d) ...............................................$
    Motion costs CPLR § 8202 ...................................................................$
    Appeal to App. Div. or App. Term before argument CPLR § 8203(1) .......................$
    Appeal to App. Div. or App. Term for argument CPLR § 8203(2) ..........................$
    Appeal to Court of Appeals before argument CPLR § 8204(1)............................$
    Appeal to Court of Appeals for argument CPLR § 8204(2) ...................................$

Total Costs ...........................................................................$700.00 ✓

Disbursements:

    Fee for Index Number CPLR § 8018(a) .............................................$190.00   210.00
    Referee's fees CPLR § 8301(a)(1) .....................................................$
    Commissioner's compensation CPLR § 8301(a)(2) ...........................$
    Clerk's Fee, filing notice of pendency or attach CPLR § 8018(e), § 8021(a)(12) .........$
    Clerk's Fee cancellation notice of pendency CPLR § 8021(a)(12) ..........$
    Entering and docketing judgment CPLR § 83201(a)(7), § 8201(a)(2) ...................$
    Paid for searches CPLR § 8301(a)(10).............................................$
    Affidavits and acknowledgments CPLR § 8009...............................$
    Serving copy of summons & complaint CPLR § 8011(c)(1), § 8301(d)......$95.00
    Note of Issue CPLR § 8020(a).............................................................$   95.00
    Paid referee's report CPLR § 8301(a)(12) ......................................$
    Certified copies of papers CPLR § 8301(a)(4) ...............................$
    Satisfaction piece CPLR § 5020(a), § 8021......................................$
    Transcripts and filing CPLR § 8201 .................................................$
    Certified copy of judgment CPLR § 8201 .......................................$
    Postage CPLR § 8301(a)(12).............................................................$
    Jury fee CPLR § 8020(c)(1).................................................................$
    Stenographer's fees CPLR § 8301 ..............................EBT..............$   250.00

**FILED**

MAR 20 2018

COUNTY CLERK'S OFFICE
NEW YORK

Sheriff's fees on execution CPLR § 8011(b), § 8012 ................................................. $

Sheriff's fees, attachment, arrest, etc. CPLR § 8011(a)(c)(2), (3)(g) ........................... $

Paid printing cases CPLR § 8301(a)(6) ...................................................................... $

Paid printing case CPLR § 8301(a)(6) ........................................................................ $

Clerk's fees Court of Appeals CPLR § 8301(a)(12) .................................................... $

Paid copies of papers CPLR §8 016(a)(4) .................................................................. $

Motion expenses CPLR § 8301(b).............................................................................. $   45.00

Fees for publication CPLR § 8301(a)(3) ..................................................................... $

Serving Subpoena CPLR § 8011(c)(1), § 8301(d) ............................................ ~~$610.00~~

Paid for Register's Search CPLR § 8301(a)(10) ......................................................... $

Paid for County Clerk's Search.................................................................................. $

Paid for Loan Commissioner's Search........................................................................ $

Paid for U.S. District Court Search............................................................................. $

Paid for U.S. Circuit Court Search ............................................................................. $

Paid for Tax Search ................................................................................................... $

Paid for Referee's Report .......................................................................................... $

Attendance of Witnesses CPLR § 8001(a)(b)(c), 21 8301(a)(1) ...................... ~~$100.00~~

Cost of Deposition and Video Recording, Editing and Playback
of Testimony of Anna Thorsdottir CPLR § 8301(a)(13)............................... ~~$4,497.07~~

Total Disbursements................................................................................... ~~$4,782.07~~   600.00

Total Costs and Disbursements................................................................. ~~$5,482.07~~   1300.00

    The expenses incurred in connection with the videotape testimony were reasonable

and necessary as the parties were required to conduct an expedited videotaped deposition

of Anna Thorsdottir in order to preserve her testimony and present the same for trial as a

result of the following events: after Plaintiff subpoenaed the witness for trial; at Defendant's

request, Plaintiff agreed to defer the witness' testimony until Plaintiff's case in chief;

Defendant's counsel failed to inform the witness of the adjourned trial date; the witness

indicated her unavailability shortly before the adjourned dates; as a result, the parties were

directed to take the witness' testimony at deposition which deposition was conducted one

week before the trial resumed.[1]  Portions of the witness' video testimony was played into

the record at trial.  Such costs are properly a taxable disbursement.  *See Kellener v. Union*

---

[1] The costs of Ms. Thorsdottir's deposition, video recording and playback was divided equally by
the parties.  The attached invoices represent the portion paid by Plaintiff.

*Carbide Corp.*, 1997 WL 34819558 (Sup. Ct. Westchester Co.); *Aliano v. St. Charles Hosp.*, 2008 WL 8713688 (Sup. Ct. Suffolk Co.).

The undersigned, attorney at law of the State of New York and attorney of record for the plaintiff in the above entitled action, states that the disbursements above-specified have been or will necessarily be made or incurred therein and are reasonable in amount. The undersigned affirms this statement to be true under the penalties of perjury.[2] Copies of the paid invoices for service of the trial subpoenas and for the transcription and the video recording, editing and playback at trial of the testimony of Anna K. Thorsdottir.

Dated: New York, New York
       March 20, 2018

Michael J. Giusto, Esq.

TO:   Pavia & Harcourt LLP
      Attorneys for Defendant
      230 Park Avenue
      New York, New York 10169
      (212) 980-3500

FILED

MAR 2 0 2018

COUNTY CLERK'S OFFICE
NEW YORK

---

[2] Plaintiff seeks to tax its disbursements for the service of trial subpoenas on Cushman & Wakefield, Inc., Walter & Samuels, R&L Construction, Inc., Anna Thorsdottir and Old Structure Engineering.

3

**Veritext Corp**
**New York Region**

330 Old Country Rd., Suite 300
Mineola NY 11501
Tel. (516) 608-2400 Fax. (516) 608-2450
Fed. Tax ID: 20-3132569



| | |
|---|---|
| **Bill To:** Michael Giusto Esq.<br>Neufeld, O'Leary & Giusto<br>370 Lexington Ave.<br>Suite 908<br>New York, NY, 10017-6588 | **Invoice #:**  NY3078308<br>**Invoice Date:**  8/29/2017<br>**Balance Due:**  $0.00 |

| | |
|---|---|
| **Case:** | Bistro Shop  v. |
| **Job #:** | 2672115 \| Job Date: 8/7/2017 \| Delivery: Daily |
| **Billing Atty:** | Michael Giusto Esq. |
| **Location:** | Pavia & Harcourt |
| | 230 Park Ave  \| Suite 2401 \| New York, NY 10169 |
| **Sched Atty:** | Michael Giusto Esq. \| Neufeld, O'Leary & Giusto |

| Witness | Description | Units | Quantity | Price | Amount |
|---|---|---|---|---|---|
| | Original with 1 Certified Transcript | Page | 309.00 | $4.40 | $1,359.60 |
| | Transcript - Fee for Daily | Page | 309.00 | $3.95 | $1,220.55 |
| Anna Thorsdottir | Attendance Fee | 1 | 2.00 | $85.00 | $170.00 |
| | Litigation Package | 1 | 1.00 | $46.00 | $46.00 |
| | Shipping & Handling - Expedited | Package | 1.00 | $51.40 | $51.40 |

| | |
|---|---|
| **Notes:**  Replaces Invoice # NY3056976<br>This is your 1/2 share<br>Combined invoices total 5,101.64<br>Your share is 2,550.82<br>**Adjusted invoice. Credit applied for 1/2 daily charge.<br><br>Courtesy Discount Applied | **Invoice Total:**  $2,847.55<br>**Courtesy Discounts:**  ($296.73)<br>**Net Total:**  $2,550.82<br>**Payment:**  ($2,010.07)<br>**Credit:**  ($540.75)<br>**Interest:**  $0.00<br>**Balance Due:**  $0.00 |

TERMS:   Payable upon receipt. Accounts 30 days past due will bear a finance charge of 1.5% per month. Accounts unpaid after 90 days agree to pay all collection costs, including reasonable attorney's fees. Contact us to correct payment errors. No adjustments will be made after 90 days. For more information on charges related to our services please consult http://www.veritext.com/services/all-services/services-information

**To pay online, go to**
**www.veritext.com**
Veritext accepts all major credit cards
(American Express, Mastercard, Visa, Discover)

26471

**Please remit payment to:**
**Veritext**
**P.O. Box 71303**
**Chicago IL 60694-1303**

| | |
|---|---|
| **Invoice #:** | NY3078308 |
| **Job #:** | 2672115 |
| **Invoice Date:** | 8/29/2017 |
| **Balance:** | $0.00 |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------x
BISTRO SHOP, LLC,

                Plaintiff,

   -against-                       Index No. 110907/09

N.Y. PARK N. SALEM INC.,

                Defendant.
-------------------------------------------------------------x

JudgmenT           1 — 1

**FILED AND
DOCKETED**

MAR 2 0 2018
AT     4:25 P M
N.Y., CO. CLK'S OFFICE

NEUFELD, O'LEARY & GIUSTO
Attorneys for Plaintiff
370 Lexington Avenue, Suite 908
New York, New York 10017
(212) 986-0999

# EXHIBIT 2

# CHASE ⬡

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218-2051

March 27, 2018 through March 30, 2018

Acco ‑‑‑‑‑ ‑119255

## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

00000030 DRE 802 219 09018 NNNNNNNNNN  1 000000000 64 0000

BISTRO SHOP, LLC
40 E 78TH ST APT 11F
NEW YORK NY 10075-1830

## SAVINGS SUMMARY      Chase Business Premier Savings

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $0.00 |
| Deposits and Additions | 3 | 2,272,710.44 |
| Electronic Withdrawals | 1 | -100,000.00 |
| Other Withdrawals | 2 | -530,000.00 |
| Ending Balance | 6 | $1,642,710.44 |
| | | |
| Annual Percentage Yield Earned This Period | | 0.11% |
| Interest Paid This Period | | $13.89 |
| Interest Paid Year-to-Date | | $13.89 |

## TRANSACTION DETAIL

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | Beginning Balance | | $0.00 |
| 03/28 | Transfer From Chk Xxxxxxxx7465 | 1,860,172.54 | 1,860,172.54 |
| 03/28 | 03/28 Transfer To Chk Xxxxx6922 | -300,000.00 | 1,560,172.54 |
| 03/28 | 03/28 Withdrawal | -230,000.00 | 1,330,172.54 |
| 03/29 | Transfer From Chk Xxxxxxxx7465 | 412,524.01 | 1,742,696.55 |
| 03/29 | 03/29 Online Transfer To Chk ...6922 Transaction#: 7018889760 | -100,000.00 | 1,642,696.55 |
| 03/30 | Interest Payment | 13.89 | 1,642,710.44 |
| | Ending Balance | | $1,642,710.44 |

20 deposited items are provided with your account each month. There is a $0.40 fee for each additional deposited item.

# CHASE ⬡

March 27, 2018 through March 30, 2018

19255

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
•   Your name and account number
•   The dollar amount of the suspected error
•   A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information
We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC.

   JPMorgan Chase Bank, N.A. Member FDIC

# CHASE ⊙

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218-2051

March 31, 2018 through April 30, 2018

9265

00202701 DRE 802 219 12118 NNNNNNNNNNN  1 0000000000 64 0000
BISTRO SHOP, LLC
40 E 76TH ST APT 11F
NEW YORK NY 10075-1830

## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |



## SAVINGS SUMMARY    Chase Business Premier Savings

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $1,642,710.44 |
| Deposits and Additions | 2 | 159.57 |
| Electronic Withdrawals | 3 | -140,029.00 |
| Ending Balance | 5 | $1,502,841.01 |
| | | |
| Annual Percentage Yield Earned This Period | | 0.04% |
| Interest Paid This Period | | $57.85 |
| Interest Paid Year-to-Date | | $71.74 |

## TRANSACTION DETAIL

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | Beginning Balance | | $1,642,710.44 |
| 04/02 | 03/31 Online Transfer To Chk ...7198 Transaction#: 7026076936 | -15.00 | 1,642,695.44 |
| 04/02 | 03/31 Online Transfer To Chk ...3610 Transaction#: 7026078062 | -14.00 | 1,642,681.44 |
| 04/05 | 04/05 Online Transfer To Chk ...6922 Transaction#: 7038672932 | -140,000.00 | 1,502,681.44 |
| 04/19 | Remote Online Deposit       1 | 101.72 | 1,502,783.16 |
| 04/30 | Interest Payment | 57.85 | 1,502,841.01 |
| | Ending Balance | | $1,502,841.01 |

30 deposited items are provided with your account each month.  There is a $0.40 fee for each additional deposited item.

You could earn an even higher interest rate on your  Chase Business Premier Savings account when you have activity on your primary checking account each month   Visit any of our branches for details or call us at the telephone number on your statement.

---

# CHASE ⊙

March 31, 2018 through April 30, 2018
Accou                                    9265

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS: Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
  •   Your name and account number
  •   The dollar amount of the suspected error
  •   A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days for 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:  Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement.  If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A.  Member FDIC

 JPMorgan Chase Bank, N.A. Member FDIC

# CHASE ○

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218-2051

May 01, 2018 through May 31, 2018

9255

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

00010664 DRE 802 219 15218 NNNNNNNNNNN  1 000000000 64 0000

BISTRO SHOP, LLC
40 E 76TH ST APT 11F
NEW YORK NY 10075-1630

## We updated our Deposit Account & Wire Agreements

The following changes were made May 20, 2018:

- We published an updated version of our Deposit Account Agreement. You can get the latest agreement at a branch or by request when you call us. Here are some important changes:

  - Effective August 1, we will notify you in advance of any changes to the Deposit Account Agreement that would adversely affect you, unless the change is necessary to comply with a legal requirement. (General Account Terms, Section I, Changes to the agreement)

  - We clarified the language that explains when we may charge a Non-Chase ATM fee for balance inquiries and transfers when you use a non-Chase ATM. (Electronic Funds Transfer Service Terms, Section A, Types of EFT Services)

- We consolidated all of our Chase wire agreements, except for the Online Wire Agreement. In addition to making sure the terms and definitions of the Wire Transfer Agreement are consistent, we made the following changes:

  - When we amend the agreement, we will send you notice of the change and may refer you to a branch or your banker for the updated agreement.

  - When you send a wire, we will send you an email notification on the status of your wire if you have provided your email address.

Please call us at the number on this statement if you have any questions.

### SAVINGS SUMMARY    Chase Business Premier Savings

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $1,502,841.01 |
| Deposits and Additions | 1 | 115.08 |
| Electronic Withdrawals | 7 | -502,841.01 |
| Ending Balance | 8 | $1,000,115.08 |
| | | |
| Annual Percentage Yield Earned This Period | | 0.11% |
| Interest Paid This Period | | $115.08 |
| Interest Paid Year-to-Date | | $186.82 |

---

# CHASE ○

May 01, 2018 through May 31, 2018

9255

## TRANSACTION DETAIL

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | Beginning Balance | | $1,502,841.01 |
| 05/02 | 05/02 Online Transfer To Chk ...0165 Transaction#: 7114107200 | -2,841.01 | 1,500,000.00 |
| 05/08 | 05/08 Online Transfer To Chk ...6922 Transaction#: 7130861309 | -100,000.00 | 1,400,000.00 |
| 05/09 | 05/09 Online Transfer To Chk ...6922 Transaction#: 7132745943 | -70,000.00 | 1,330,000.00 |
| 05/14 | 05/14 Online Transfer To Chk ...6922 Transaction#: 7146136783 | -30,000.00 | 1,300,000.00 |
| 05/17 | 05/17 Online Transfer To Chk ...6922 Transaction#: 7154707662 | -120,000.00 | 1,180,000.00 |
| 05/18 | 05/18 Online Transfer To Chk ...6922 Transaction#: 7158755759 | -80,000.00 | 1,100,000.00 |
| 05/24 | 05/24 Online Transfer To Chk ...6922 Transaction#: 7172655040 | -100,000.00 | 1,000,000.00 |
| 05/31 | Interest Payment | 115.08 | 1,000,115.08 |
| | Ending Balance | | $1,000,115.08 |

30 deposited items are provided with your account each month.  There is a $0.40 fee for each additional deposited item.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days for 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement.  If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A.  Member FDIC

 JPMorgan Chase Bank, N.A. Member FDIC

# CHASE ◯

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218-2051

June 01, 2018 through June 29, 2018
Account Number       8255

00034271 DRE 602 219 18118 NNNNNNNNNN  1 000000000 64 0000
BISTRO SHOP, LLC
40 E 78TH ST APT 11F
NEW YORK NY 10075-1830

| CUSTOMER SERVICE INFORMATION | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

## SAVINGS SUMMARY    Chase Business Premier Savings

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $1,000,115.08 |
| Deposits and Additions | 1 | 78.40 |
| Electronic Withdrawals | 5 | -330,500.00 |
| **Ending Balance** | **6** | **$669,693.48** |
| Annual Percentage Yield Earned This Period | | 0.11% |
| Interest Paid This Period | | $78.40 |
| Interest Paid Year-to-Date | | $265.22 |

Your monthly service fee was waived because you maintained an average savings balance of $25,000 or more during the statement period.

## TRANSACTION DETAIL

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | Beginning Balance | | $1,000,115.08 |
| 06/11 | 06/11 Online Transfer To Chk ...6922 Transaction#: 7222248392 | -25,000.00 | 975,115.08 |
| 06/14 | 06/14 Online Transfer To Chk ...0165 Transaction#: 7230248172 | -5,000.00 | 970,115.08 |
| 06/19 | 06/19 Online Transfer To Chk ...6922 Transaction#: 7243494401 | -200,000.00 | 770,115.08 |
| 06/28 | 06/28 Online Transfer To Chk ...3233 Transaction#: 7268618089 | -500.00 | 769,615.08 |
| 06/28 | 06/28 Online Transfer To Chk ...3593 Transaction#: 7268619248 | -100,000.00 | 669,615.08 |
| 06/29 | Interest Payment | 78.40 | 669,693.48 |
| | **Ending Balance** | | **$669,693.48** |

30 deposited items are provided with your account each month. There is a $0.40 fee for each additional deposited item.

---

# CHASE ◯

June 01, 2018 through June 29, 2018
Account Number       8255

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS: Call us at 1-866-564-2262 or write us at the
address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is
incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error
appeared. Be prepared to give us the following information:
•    Your name and account number
•    The dollar amount of the suspected error
•    A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new
accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes
us to complete our investigation.

IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS: Contact the bank immediately if your statement is
incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears,
you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the
Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by
JPMorgan Chase Bank, N.A. Member FDIC.

 JPMorgan Chase Bank, N.A. Member FDIC

# CHASE ◎

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218-2051

June 30, 2018 through July 31, 2018

9255

00329656 DRE 602 219 21318 NNNNNNNNNN  1 000000000 64 0000

BISTRO SHOP, LLC
40 E 78TH ST APT 11F
NEW YORK NY 10075-1830

## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

---

## SAVINGS SUMMARY   Chase Business Premier Savings

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $669,693.48 |
| Deposits and Additions | 2 | 97,035.50 |
| Electronic Withdrawals | 12 | -558,200.00 |
| Ending Balance | 14 | $208,528.98 |

| | |
|---|---|
| Annual Percentage Yield Earned This Period | 0.11% |
| Interest Paid This Period | $35.50 |
| Interest Paid Year-to-Date | $300.72 |

Your monthly service fee was waived because you maintained an average savings balance of $25,000 or more during the statement period.

## TRANSACTION DETAIL

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | Beginning Balance | | $669,693.48 |
| 07/02 | 07/02 Online Transfer To Chk ...6922 Transaction#: 7280719259 | -150,000.00 | 519,693.48 |
| 07/03 | Online Transfer From Chk ...3593 Transaction#: 7283927483 | 97,000.00 | 616,693.48 |
| 07/03 | 07/03 Online Transfer To Chk ...6922 Transaction#: 7283938661 | -100,000.00 | 516,693.48 |
| 07/03 | 07/03 Online Transfer To Chk ...1870 Transaction#: 7284145241 | -10,000.00 | 506,693.48 |
| 07/05 | 07/04 Online Transfer To Chk ...3233 Transaction#: 7288650354 | -200.00 | 506,493.48 |
| 07/06 | 07/06 Online Transfer To Chk ...3233 Transaction#: 7295018741 | -500.00 | 505,993.48 |
| 07/09 | 07/08 Online Transfer To Chk ...3593 Transaction#: 7297616139 | -10,000.00 | 495,993.48 |
| 07/09 | 07/09 Online Transfer To Chk ...3593 Transaction#: 7297704651 | -10,000.00 | 485,993.48 |
| 07/10 | 07/10 Online Transfer To Chk ...6922 Transaction#: 7303032683 | -100,000.00 | 385,993.48 |
| 07/16 | 07/16 Online Transfer To Chk ...6922 Transaction#: 7319819399 | -100,000.00 | 285,993.48 |
| 07/27 | 07/27 Online Transfer To Chk ...6922 Transaction#: 7347406335 | -75,000.00 | 210,993.48 |
| 07/27 | 07/27 Online Transfer To Chk ...0165 Transaction#: 7349768626 | -1,500.00 | 209,493.48 |
| 07/31 | 07/31 Online Transfer To Chk ...3233 Transaction#: 7358857985 | -1,000.00 | 208,493.48 |
| 07/31 | Interest Payment | 35.50 | 208,528.98 |
| | Ending Balance | | $208,528.98 |

30 deposited items are provided with your account each month. There is a $0.40 fee for each additional deposited item.

Page 1 of 2

---

# CHASE ◎

June 30, 2018 through July 31, 2018

9255

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
  • Your name and account number
  • The dollar amount of the suspected error
  • A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information
We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC.

 JPMorgan Chase Bank, N.A. Member FDIC

Page 2 of 2

## CHASE O

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218-2051

August 01, 2018 through August 31, 2018
I9255

0033545 DRE 802 219 34416 NNNNNNNNNN  1 000000000 64 0000
BISTRO SHOP, LLC
40 E 78TH ST APT 11F
NEW YORK NY 10075-1830

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

### SAVINGS SUMMARY    Chase Business Premier Savings

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $208,528.98 |
| Deposits and Additions | 1 | 4.13 |
| Electronic Withdrawals | 5 | -206,000.00 |
| Ending Balance | 6 | $2,533.11 |
| | | |
| Annual Percentage Yield Earned This Period | | 0.07% |
| Interest Paid This Period | | $4.13 |
| Interest Paid Year-to-Date | | $304.85 |

Your monthly service fee was waived because you maintained an average savings balance of $25,000 or more during the statement period.

### TRANSACTION DETAIL

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | Beginning Balance | | $208,528.98 |
| 08/01 | 08/01 Online Transfer To Chk ...0165 Transaction#: 7362476373 | -1,000.00 | 207,528.98 |
| 08/01 | 08/01 Online Transfer To Chk ...6922 Transaction#: 7363464940 | -110,000.00 | 97,528.98 |
| 08/15 | 08/15 Online Transfer To Chk ...6922 Transaction#: 7402683003 | -20,000.00 | 77,528.98 |
| 08/20 | 08/20 Online Transfer To Chk ...6922 Transaction#: 7416305021 | -20,000.00 | 57,528.98 |
| 08/27 | 08/25 Online Transfer To Chk ...6922 Transaction#: 7430721824 | -55,000.00 | 2,528.98 |
| 08/31 | Interest Payment | 4.13 | 2,533.11 |
| | Ending Balance | | $2,533.11 |

30 deposited items are provided with your account each month. There is a $0.40 fee for each additional deposited item.

---

## CHASE O

August 01, 2018 through August 31, 2018
9255

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
· Your name and account number
· The dollar amount of the suspected error
· A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

 JPMorgan Chase Bank, N.A. Member FDIC

# EXHIBIT 3





**Our Work**  ›

**News**  ⌄

MEDIA COVERAGE

PRESS RELEASES

NEWSLETTERS

EVENTS

DATA  ›

REMARKS

VIDEO

**Victim Resources**  ›

**Careers**  ›

**About the Office**  ›

**Contact Us**

SEARCH  🔍

NEWS • PRESS RELEASES

# D.A. Vance Announces Indictment in Upper East Side Multimillion Dollar Mortgage Fraud

JULY 11, 2019

Manhattan District Attorney Cyrus R. Vance, Jr. today announced the indictment of PENNY BRADLEY, 54, a real estate developer, for residential mortgage fraud in which BRADLEY forged member signatures to illegally obtain millions of dollars. BRADLEY is charged in a New York State Supreme Court indictment with Residential Mortgage Fraud in the First Degree, Grand Larceny in the Second Degree, and two counts of Forgery in the Second Degree and Criminal Possession of a Forged Instrument in the Second Degree.[1]

"As alleged, Penny Bradley cashed in on her insider position and stole company funds to support her lavish lifestyle," said Manhattan D.A. Cy Vance, Jr. "My Office is dedicated to protecting the integrity of our City's residential mortgage market and holding those who attempt to undermine it criminally responsible."

According to the indictment and documents filed in court, from 2014 to 2019 BRADLEY violated her duties as the managing member of 46 East 82nd Street LLC and stole company funds for personal expenses and unrelated business ventures. BRADLEY also used company property as collateral to obtain a loan for unrelated real estate investments, and forged member signatures to refinance debt encumbering the townhouse.

In March 2014, 46 East 82nd Street LLC was formed to acquire, renovate, and sell a townhouse located at 46 East 82nd Street. BRADLEY was the sole member of Norfolk Street Management LLC, the managing member of 46 East 82nd Street LLC. In that capacity, BRADLEY was solely responsible for managing the renovation and potential sale of the townhouse and

7/17/2019    18-10122-jlg    Doc 13    Vance Announces Indictment in Upper East Side Multimillion Dollar Mortgage Fraud | Manhattan District Attorney's Office

Filed 07/17/19    Entered 07/17/19 09:39:21    Main Document

Pg 58 of 60

safeguarding company money and property, including funds invested by members of 46 East 82nd Street LLC and two loans from Alpine Capital Ba

Between 2014 to 2016, BRADLEY stole over $500,000 from 46 East 82nd Street LLC to pay for personal expenses and unrelated business debts. Personal expenditures included rent payments, vacations, monthly paymer on her auto loan for her Range Rover, and monthly parking garage fees.

In 2015, BRADLEY obtained a personal loan from Global Payment Ser Limited ("GPS") to invest in unrelated real estate projects. To procure BRADLEY agreed to allow GPS to record a lien against the 46 East 8: Street townhouse if she failed to pay $2.6 million by its maturity date. Subsequently, BRADLEY defaulted on the loan and GPS recorded a r against the townhouse.




In 2016, BRADLEY attempted to refinance the GPS mortgage by encumber the townhouse with a junior mortgage from Atlas Union Corp ("Atlas"). Atlas and First American Title Insurance Company ("First American"), the title insurance company insuring the loan, required the defendant to obtain a n company operating agreement executed by all the members of the compa In August 2016, BRADLEY falsely claimed that all the members were contacted and requested to close on the Atlas loan without submitting the new operating agreement; Atlas denied the defendant's request.

Thereafter, in late August 2016, Atlas agreed to refinance the existing loans from both Alpine and GPS with a loan for $11.5 million to 46 East 82nd Stre LLC. However, to obtain this loan, Atlas required the defendant to get writte consent of a majority in interest of members of 46 East 82nd Street LLC.

In September 7, 2016, the defendant emailed her attorney the "Consent of Majority in Interest of Members of 46 East 82nd Street LLC" and its six signatures pages for purposes of closing on the Atlas loan. The signature pages included forged signatures of two LLC members. Two days later, on September 9, 2016, the defendant signed the required documents on beha of 46 East 82nd Street LLC and certified as to the validity of the signatures the Consent of Majority in Interest of Members of 46 East 82nd Street LLC document to close on the Atlas loan of $11.5 million.

In December 2017, the Atlas loan matured and 46 East 82nd Street LLC defaulted on the loan.

Assistant D.A. Jaime Hickey-Mendoza is handling the prosecution of this ca under the supervision of Assistant D.A.s Judy Salwen, Principal Deputy Chi of the Rackets Bureau; Michael Ohm, Deputy Bureau Chief and Jodie Kane Chief of the Rackets Bureau, as well as Executive Assistant D.A. Michael

Sachs, Chief of the Investigation Division. Supervising Financial Investigato
Wei Man Tang assisted with the investigation, under the supervision of Iren
Serrapica, Deputy Chief of FAFI, and Robert Demarest, Chief of FAFI.
Supervising Rackets Investigator Donato Siciliano, Rackets Investigator
Samuel Morales, and paralegals Madeleine Lippey and Maximilian Perkins
also assisted with the case.



Defendant Information

PENNY BRADLEY, D.O.B 2/5/1965

New York, New York

Charged:

- Residential Mortgage Fraud in the First Degree, a class B felony, 1 count
- Grand Larceny in the Second Degree, a class C felony, 1 count
- Forgery in the Second Degree, a class D felony, 2 counts

Criminal Possession of a Forged Instrument in the Second Degree, a class
felony, 2 counts

[1] The charges contained in the indictment are merely allegations, and the
defendant is presumed innocent unless and until proven guilty. All factual
recitations are derived from documents filed in court, including the
indictments, and statements made on the record in court.

 Manhattan District Attorney's Office

📍 MAIN OFFICE
One Hogan Place
New York, NY 10013
**212.335.9000**

📍 HARLEM OFFICE
163 West 125th Street
New York, NY 10027
**212.864.7884**

📍 WASHINGTON HEIGHTS OFFICE
530 West 166th Street, Suite 600A
New York, NY 10032
**212.335.3320**

ABOUT THE OFFICE                    OUR WORK

EVENTS

NEWS

VICTIM RESOURCES

ESPANOL

CONTACT US

CAREERS & TRAINING

Keep up with us! Sign up for our
newsletter.

All Content © 2019. Dis

SIGN UP