| | |
|---|---|
| **LaMONICA HERBST & MANISCALCO, LLP**<br>3305 Jerusalem Avenue, Suite 201<br>Wantagh, New York 11793<br>Telephone: (516) 826-6500<br>Joseph S. Maniscalco, Esq.<br>Jordan D. Weiss, Esq. | Hearing Date: November 6, 2019 at 11:00 a.m.<br>Objections Due: October 30, 2019 |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:                                                              Chapter 11

PENNY ANN BRADLEY,                                   Case No.: 18-10122 (JLG)

            Debtor.
----------------------------------------------------------------x

## NOTICE TO ATLAS UNION CORP. OF DEBTOR AND DEBTOR-IN-POSSESSION'S MOTION TO DISALLOW CLAIM NUMBER 3 FILED BY ATLAS UNION CORP. AGAINST THE DEBTOR'S ESTATE

Attn:   Atlas Union Corp.
        C/o Nolan E. Shanahan, Esq.
        Cole Schotz, P.C.
        1325 Avenue of the Americas, 19th Floor
        New York, New York 10019

Chapter 11 Debtor and Debtor-in-Possession Penny Bradley (the "**Debtor**"), by her special counsel, LaMonica Herbst & Maniscalco, LLP has filed an objection to Claim Number 3 filed by Atlas Union Corp. ("Atlas" or "You") in this bankruptcy case.

**Your claim may be reduced, modified, or eliminated. You should read these papers carefully and discuss them with your attorney.**

If you do not want the court to eliminate or change your claim, then on or before October 30, 2019, you or your lawyer must:

File with the court a written response to the objection, explaining your position, as follows: (i) through the Bankruptcy Court's electronic filing system, which may be accessed through the internet at the Bankruptcy Court's website at www.nysb.uscourts.gov, in portable document format (PDF) using Adobe Exchange Software for conversion; or (ii) if a party is unavailable to file electronically, such party shall submit the objection in PDF format on a portable media in an envelope with the case name, case number, type and title of document, document number to which the objection refers and the file name on the outside of the envelope. An objection filed by a party with no legal representation shall comply with Section (ii) as set forth in this paragraph. If you mail your response to the court for filing, you must mail it early enough so that the court will **receive** it on or before the date stated above.

You must also send a copy to:

LaMonica Herbst and Maniscalco, LLP
Attn: Joseph S. Maniscalco, Esq.
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793

Additionally, if you oppose the objection to your claim, you must attend the hearing on the objection, scheduled to be held on November 6, 2019, at 11:00 a.m. in Courtroom 601, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004.

If you or your attorney do not take these steps, the court may decide that you do not oppose the objection to your claim.

Dated: September 23, 2019
      Wantagh, New York      **LaMONICA HERBST & MANISCALCO, LLP**
                                      Special Counsel to the Debtor and Debtor-in-Possession

                            By:     *s/ Joseph S. Maniscalco*
                                    Joseph S. Maniscalco, Esq.
                                    Jordan D. Weiss, Esq.
                                    3305 Jerusalem Avenue, Suite 201
                                    Wantagh, New York 11793
                                    Telephone: (516) 826-6500

**LaMONICA HERBST & MANISCALCO, LLP**  Hearing Date: November 6, 2019 at 11:00 a.m.
3305 Jerusalem Avenue, Suite 201   Objections Due: October 30, 2019
Wantagh, New York 11793
Telephone: (516) 826-6500
Joseph S. Maniscalco, Esq.
Jordan D. Weiss, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
In re:                                                                          Chapter 11

PENNY ANN BRADLEY,                                        Case No.: 18-10122 (JLG)

        Debtor.
---------------------------------------------------------------x

**NOTICE OF DEBTOR AND DEBTOR-IN-POSSESSION'S MOTION
TO DISALLOW CLAIM NUMBER 3 FILED BY ATLAS UNION CORP.
AGAINST THE DEBTOR'S ESTATE**

**PLEASE TAKE NOTICE,** that on **November 6, 2019 at 11:00 a.m.**, or as soon thereafter as counsel may be heard, a hearing shall be held at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004 (the "Court") before the Honorable James L. Garrity Jr., United States Bankruptcy Judge on the motion (the "Motion") of Chapter 11 Debtor and Debtor-in-Possession Penny Ann Bradley (the "Debtor"), by her special counsel, LaMonica Herbst & Maniscalco, LLP, seeking the entry of an Order pursuant to 11 U.S.C. (the "Bankruptcy Code") §§ 105(a) and 502, and Rule 3007(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") disallowing, in its entirety, claim number 3 (the "Atlas Claim") filed by Atlas Union Corp. ("Atlas") in the amount of $18,465,333.71, together with such other and different relief as the Court deems just and proper.

**PLEASE TAKE FURTHER NOTICE,** that objections to the relief requested in the Motion, if any, must be in writing, conform with the Bankruptcy Rules and Bankruptcy Code, state with particularity the grounds thereof and be filed with the Court, with a courtesy copy to

3

the Chambers of the Honorable James L. Garrity Jr., United States Bankruptcy Judge, and served upon, so as to be received by, LaMonica Herbst & Maniscalco, LLP, the special counsel for the Debtor, Attn: Joseph S. Maniscalco, Esq., no later than October 30, 2019 as follows: (i) through the Bankruptcy Court's electronic filing system, which may be accessed through the internet at the Bankruptcy Court's website at www.nysb.uscourts.gov; in portable document format (PDF) using Adobe Exchange Software for conversion; or (ii) if a party is unavailable to file electronically, such party shall submit the objection in PDF format on a portable media in an envelope with the case name, case number, type and title of document, document number to which the objection refers and the file name on the outside of the envelope. An objection filed by a party with no legal representation shall comply with Section (ii) as set forth in this paragraph.

**PLEASE TAKE FURTHER NOTICE**, that the hearing on the Motion may be adjourned from time to time without any other announcement other than that set forth in open Court.

Dated: September 23, 2019
      Wantagh, New York      **LaMONICA HERBST & MANISCALCO, LLP**
                                          Special Counsel to the Debtor and Debtor-in-Possession

                              By:    *s/ Joseph S. Maniscalco*
                                       Joseph S. Maniscalco, Esq.
                                       Jordan D. Weiss, Esq.
                                       3305 Jerusalem Avenue, Suite 201
                                       Wantagh, New York 11793
                                       Telephone: (516) 826-6500

**LaMONICA HERBST & MANISCALCO, LLP**  Hearing Date: November 6, 2019 at 11:00 a.m.
3305 Jerusalem Avenue, Suite 201  Objections Due: October 30, 2019
Wantagh, New York 11793
Telephone: (516) 826-6500
Joseph S. Maniscalco, Esq.
Jordan D. Weiss, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                                                   Chapter 11

PENNY ANN BRADLEY,                                      Case No.: 18-10122 (JLG)

     Debtor.
-------------------------------------------------------------x

**DEBTOR AND DEBTOR-IN-POSSESSION'S MOTION TO DISALLOW CLAIM NUMBER 3 FILED BY ATLAS UNION CORP. AGAINST THE DEBTOR'S ESTATE**

  Penny Ann Bradley, the Chapter 11 debtor and debtor-in-possession (the "Debtor"), by and through her special counsel, LaMonica Herbst & Maniscalco, LLP ("LH&M"), files this motion (the "Motion") pursuant to 11 U.S.C. (the "Bankruptcy Code") §§ 105(a) and 502, and Rule 3007(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking the entry of an Order disallowing, in its entirety, claim number 3 (the "Atlas Claim") filed by Atlas Union Corp. ("Atlas") in the amount of $18,465,333.71, and respectfully states as follows:

**Preliminary Statement**

  1. Atlas is not entitled to any distribution from the Debtor's estate on account of the Atlas Claim. Atlas, a purported unsecured creditor, is limited as against the Debtor to amounts owed as of the Filing Date (as defined below) plus reasonable and necessary post-petition legal fees and expenses; Atlas is not entitled to payment of any post-petition interest from the Debtor's estate. Moreover, notwithstanding the provision in the underlying loan documents for the application of proceeds, Atlas is not entitled to side step the bar on post-petition interest as

against the Debtor's estate by asserting that the proceeds of the Real Property (as defined below) were applied to interest, leaving portions of the principal as the balance payable by the Debtor.

2.  As of the Filing Date, Atlas asserts that it was owed $13,681,526.79.[1] Atlas recently received authority in the Foreclosure Action (as defined below) to sell the Real Property for $15,100,000,[2] which amount is in excess of the amount owed as of the Filing Date plus any reasonable, necessary, post-petition interest and fees. Accordingly, upon Atlas' receipt of the Purchase Price (as defined below), Atlas will not be entitled to any claim against the Debtor's estate and the Atlas Claim should be disallowed in its entirety.

3.  Alternatively, to the extent this Court determines that Atlas is entitled to assert post-petition interest against the Debtor's estate, Atlas is nonetheless not entitled to any distribution from the Debtor's estate because the actual, fair market value of the Real Property is significantly in excess of the amount of the Atlas Claim.

**Procedural Background**

4.  On January 18, 2018 (the "Filing Date"), the Debtor, *pro se*, filed a voluntary petition (the "Petition") for reorganization under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court").

5.  On March 1, 2018, the Debtor filed her bankruptcy schedules and statement of financial affairs. See Dkt. No. 27.

6.  By Order dated March 14, 2018, the Debtor retained Daniel S. Alter, Esq. ("Alter"), as her general bankruptcy counsel in this case. See Dkt. No. 32.

---

[1] The Debtor reserves the right to dispute Atlas' calculation of the amounts it was owed as of the Filing Date, which dispute is currently pending in the Foreclosure Action and awaiting decision by a special referee.

7. The Debtor has continued in the management of her business and operation of her affairs as a debtor and debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

8. No trustee or examiner has been appointed and no official committee of unsecured creditors has been formed.

9. On March 14, 2019, Atlas filed an *ex parte* application pursuant to Bankruptcy Rule 2004, seeking the examination of the Debtor [Dkt. No. 80] (the "Atlas Rule 2004 Application").

10. On April 16, 2019, the United States Trustee examined the Debtor at her meeting of creditors pursuant to 11 U.S.C. § 341(a), which meeting was closed.

11. On June 18, 2019. the Debtor filed an application to retain LH&M as her special bankruptcy counsel.

12. On July 9, 2019, the Debtor participated in her initial debtor interview with the United States Trustee and such meeting was concluded with the Debtor having provided all information requested by the Trustee.

13. On July 18, 2019, the Debtor filed a Motion to Estimate the Claim of Atlas Against the Debtor's Estate in the Amount of $0.00 [Dkt. No. 135] (the "Estimation Motion").

14. On August 12, 2019, Atlas filed an Objection to the Estimation Motion [Dkt. No. 157] (the "Atlas Objection to Estimation").

15. On August 12, 2019, the Debtor filed a Reply in Support of the Estimation Motion and in Opposition to the Atlas Objection to Estimation [Dkt. No. 159].

---

2     Upon information and belief, Atlas failed to engage in any marketing strategy or retain a licensed real estate broker to maximize the value of the Real Property and the Debtor asserts all rights related thereto.

16. On August 14, 2019, a hearing was held on the Estimation Motion, at which the Estimation Motion was denied, without prejudice, as premature.

17. On August 21, 2019, Atlas filed the Atlas Claim. By the Atlas Claim, Atlas asserts an unsecured claim in the amount of $18,465,333.71 (the "Atlas Asserted Claim Amount") on account of the Guaranty (as defined below) of the Note (as defined below).

18. The Atlas Asserted Claim Amount is comprised of: $11,500,000 in principal; $6,571,903.79 in interest; $377,497.03 in estimated costs and attorneys' fees; $75,942.89 in expenses; less $60,010 as a credit for the UCC sale of the Membership Interests (as defined below).

**Relevant Factual Background**

**I.    The Real Property and Ownership Structure**

19. On or about May 29, 2014, 46 East 82nd Street LLC, which later changed its name to NSM82 LLC ("NSM82"), purchased real property located at and known as 46 East 82nd Street, New York, New York (the "Real Property"). At the time of purchase, the Real Property contained a five-story townhouse that required complete renovation.

20. NSM82 purchased the Real Property as an investment in order to rehabilitate the Real Property. The Real Property is located in a very desirable and marketable neighborhood for townhouses and NSM82 planned to construct, and ultimately constructed, a top of the line large luxury townhouse.

21. In furtherance of the purchase and rehabilitation of the Real Property, various investors purchased membership interests in NSM82.

22. Prior to the UCC Foreclosure (as defined below), the Debtor, directly, owned a 10.78% membership interest (the "Direct Membership Interest") in NSM82.

23. Prior to the UCC Foreclosure (as defined below), the Debtor was the sole owner of Norfolk Street Management LLC ("Norfolk"), which owned a 0.01% membership interest (the "Indirect Membership Interest," and together with the Direct Membership Interest, the "Membership Interests") in NSM82 and was the managing member of NSM82.

24. In furtherance of NSM82's purchase of the Real Property, the Real Property was encumbered by an acquisition and project loan mortgage and security agreement payable to Alpine Capital Bank ("Alpine") in the principal amount of $5,730,000 (the "Alpine First Mortgage").

25. In addition to the Alpine First Mortgage, at the time of purchase of the Real Property, NSM82 borrowed an additional $2,520,000 from Alpine and entered into a construction mortgage and security agreement, which was secured by the Real Property (the "Alpine Second Mortgage").

26. Thereafter, on April 22, 2016, in order to finance additional costs of construction along with associated "soft costs" of the Real Property, NSM82 borrowed funds from Global Payment Services, Limited (the "Global Loan").

**II.    Atlas' Note and Collateral**

27. On or about September 12, 2016, NSM82 and Atlas entered into an Amended, Restated and Consolidated Secured Promissory Note in the principal amount of $11,500,000 (the "Note"). The Note was a refinance and consolidation of the Alpine First Mortgage, Alpine Second Mortgage, and Global Loan.

28. The Note bore interest, initially, at 10.50% per annum plus the London Interbank Offered Rate ("LIBOR"), which total was subject to adjustment upon the change of LIBOR (the "Initial Interest Rate"). The Note provided for accrual of interest and payment of principal and

accrued interest upon maturity of the Note. As such, no interest payments were due on a monthly basis. Rather, the interest was accruing under the loan documents.

29. The Initial Interest Rate was applicable until the maturity date of the Note, March 1, 2017 (the "Initial Maturity Date"). Thereafter, the Note was subject to two optional extensions of three months each, to a final possible maturity date of September 1, 2017 (the "Contractual Extended Maturity Date").

30. Between the Initial Maturity Date and the Extended Maturity Date, the Note bore interest at 12% per annum plus LIBOR, which total was subject to adjustment upon the change of LIBOR (the "Extended Interest Rate").

31. In connection with the Note, NSM82 pledged the Real Property as collateral to Atlas pursuant to a mortgage (the "Mortgage") dated September 12, 2016.

32. On or about September 12, 2016, Norfolk and the Debtor executed a guaranty of the amounts due under the Note in favor of Atlas (the "Guaranty").

33. On or about September 12, 2016, in connection with the Note and the Guaranty, the Debtor entered into Pledge and Security Agreements pledging the Membership Interests as collateral (the "Security Agreement").

34. As a result of the Note, Mortgage, and Security Agreement, Atlas was secured to the Real Property and the Membership Interests.

35. NSM82 exercised its right to extend the maturity date of the Note to the Contractual Extended Maturity Date, which extension Atlas accepted.

36. Because the Real Property had not yet been sold, NSM82 and Atlas agreed to enter into a Loan Modification Agreement (the "Loan Modification"), whereby the Contractual Extended Maturity Date was extended to December 1, 2017 (the "Modified Maturity Date").

### III. The Sale and Marketing of the Real Property by the Debtor

37. Prior to the Modified Maturity Date, the rehabilitation of the Real Property and the luxury townhouse located thereon was completed and a temporary certificate of occupancy was issued. At that time, the townhouse was renovated into a top quality, extremely marketable and desirable luxury townhouse with a value of approximately $18 to $21 million.

38. Prior to the Modified Maturity Date, the Debtor spent a great deal of time negotiating with the Higher Ground Education School ("HGE"), an interested user of the Real Property. HGE sought a long-term lease of the Real Property combining the adjoining real property for use as school facilities. The Debtor engaged in discussions with the real estate broker for the adjoining property in order to determine interest in selling both properties to an investor with a long-term lease secured and in place from HGE. In fact, the Debtor was able to procure an agreement with the adjoining property owner. As a result of the Debtor's extensive efforts, obtaining a long-term lease became extremely favorable and increased the value of the Real Property to an investor dramatically.

39. The Debtor was able to negotiate a very favorable, long term lease with HGE (the "Proposed Lease"), which lease was subject to approval by the owners of the adjoining real property. Unfortunately, however, Atlas refused to permit the Real Property to be marketed for sale which delayed the process even though the desired price was at a fair market value. This caused the Proposed Lease to sit dormant for several months. Indeed, there can be no dispute that the value of the Real Property with the Proposed Lease was substantially higher than selling the Real Property as a single-family, luxury townhouse.

40. As of the Modified Maturity Date, the Real Property still had not been sold. Accordingly, NSM82 requested an additional extension of the Modified Maturity Date. Atlas

denied this request even though it knew about the prospect for a lucrative sale of the Real Property. At this time, Atlas knew there was a long term Proposed Lease in place and also knew that the Debtor had procured an interested purchaser for the Real Property with that Proposed Lease in place.

41.   Since the Debtor had secured the Proposed Lease, the Debtor was successful in procuring an investor (the "Proposed Purchaser") to purchase the Real Property and the adjoining real property for the combined amount of $34.5 million (the "Proposed Aggregate Purchase Price"). The Real Property was allocated as follows: (a) $13 million to be paid to the adjoining property owner; and the balance of $21.5 million to NSM82, the owner of the Real Property. This would have paid off Atlas in full and provided substantial returns on investment to the benefit of NSM82 and the investors in the project. Presumably, Atlas believed it would be more beneficial for it to foreclose on the Real Property and then secure the same deal and make a bigger upside payout as opposed to a simple lending rate of return.[3]

42.   Despite that a sale to the Proposed Purchaser at the Proposed Aggregate Purchase Price would have resulted in the payment to Atlas of the entire amount owing under the Note, as well as significant returns to investors, Atlas continued to refuse to allow the Real Property to be marketed and, upon information and belief, instructed HGE that they should not be communicating with the Debtor about the Real Property.[4] As a result, HGE was no longer interest in renting the Real Property and the Proposed Purchaser was no longer interested in purchasing the Real Property. Atlas' tortious interference caused a substantial setback to the

---

[3]   This is consistent with Atlas' current relationship with NSM82 and their collective purchase of Membership Interests whereby they are now equity owners with other equity owners and lender at the same time.

[4]   The Debtor was instrumental in negotiating and the sole point of contact from initial point of interest to development of drawings to the Proposed Lease and the eventual proposed sale of the Real Property.

12

Debtor's ability to maximize value for the Real Property. As of today, Atlas is selling the Real Property for substantially less than its fair market value.[5]

### III.     The Foreclosure Action and UCC Foreclosure

43.     Shortly thereafter, on December 12, 2017, Atlas commenced a foreclosure proceeding with respect to the Real Property in the Supreme Court of the State of New York, County of New York, which action was assigned index number 850289/2017 (the "Foreclosure Action").

44.     The Foreclosure Action was premised on the alleged non-monetary default of failure to obtain a final certificate of occupancy, despite having the temporary certificate of occupancy in place.[6]

45.     By the complaint (the "Foreclosure Complaint") filed in the Foreclosure Action, Atlas sought a judgment of foreclosure and sale of the Real Property and, in the event the sale of the Real Property was insufficient to satisfy Atlas' claim, a deficiency judgment against, *inter alia*, the Debtor. A true and correct copy of the Foreclosure Complaint is attached hereto as Exhibit A.

46.     On January 17, 2018, Norfolk filed a voluntary petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code with this Court.

47.     On January 18, 2018, Atlas conducted UCC foreclosure sales (the "UCC Foreclosure Sales") of the Membership Interests, at which Atlas purchased the Debtor's Membership Interests. This was conducted through a simple notice under the UCC and quick

---

[5]     Despite numerous requests for the Debtor's real estate appraiser to conduct an appraisal of the Real Property for purposes of this motion, Atlas will not allow access to the Real Property, yet is rushing a sale at $15.1 million.
[6]     Despite this, Atlas has caused the temporary certificate of occupancy "(TCO)" to lapse and is proceeding with a current sale without a TCO **or** certificate of occupancy in place.

sale process. Upon information and belief, this was not conducted in accordance with the UCC procedures and/or marketed to maximize its value.

48. On January 18, 2018, the Debtor filed for bankruptcy but Atlas has claimed that its Foreclosure Sales were conducted and completed prior to the time that the Debtor filed for bankruptcy protection.

49. By virtue of the UCC Foreclosure Sales, title to the Membership Interests passed to Atlas and the Debtor's ownership rights with respect to Membership Interests was extinguished. Moreover, as a result of the UCC Foreclosure Sales, the Debtor no longer has any ownership interest in the Real Property.

50. On January 29, 2018, Atlas filed a Motion for Relief from the Automatic Stay [Dkt. No. 11] (the "Lift Stay Motion").

51. By the Lift Stay Motion, Atlas asserts that as of December 13, 2017, it was owed $13,416,869.39 in principal and interest and that interest continued to accrue at $7,561.64 per diem.

52. To date, an Order of Reference has not been entered in the Foreclosure Action and the computation of Atlas' claim against the Real Property is being disputed in the Foreclosure Action on a variety of grounds including improper calculation of interest. The special referee has not made a decision on the claim of Atlas primarily because there are substantial issues related to the mortgage and note, the calculation of interest, and the alleged default.

53. On September 10, 2019, Atlas filed an application for an Order to Show Cause (the "OSC Application") in the Foreclosure Action to (a) stay the decision of the special referee, and (b) have a lis pendens filed against the Real Property cancelled so that Atlas could proceed

with a sale of the Real Property (the "Sale") to a third party for $15,100,000 (the "Purchase Price"). A true and correct copy of the OSC Application is attached hereto as Exhibit B.

54. By Order entered in the Foreclosure Action dated September 16, 2019 (the "Lis Pendens Cancellation Order"), the State Court cancelled the lis pendens against the Real Property, which gave Atlas the authority to sell the Real Property. A true and correct copy of the Lis Pendens Cancellation Order is attached hereto as Exhibit C. The Court did not grant Atlas' request for a stay of the special referee's decision, and did not decide whether Atlas properly marketed the Real Property to maximize its value. As stated above, for the last six (6) weeks, the Debtor has requested access to the Real Property for its appraiser and Atlas will not allow such access.

55. As stated above, the Real Property is a luxury townhouse. The Real Property was purchased for $8.8 million. The Debtor oversaw NSM82's renovations and development of the Real Property. Currently, the Real Property is ripe for sale and the New York City townhouse market is very strong. Based upon market valuations, the Debtor believes that as of the Filing Date, the Real Property was worth at least $18 to $21 million (the "Real Property Fair Market Value"). As evidence to support the Real Property Fair Market Value, attached hereto as Exhibits D and E, respectively, are: an as-completed valuation of the Real Property that was submitted by the Debtor, on behalf of NSM82, to Atlas on May 25, 2016 ("Valuation"); and a Comparative Market Analysis of Townhouse Sales dated February 26, 2019, prepared by Fred Williams, Associate Broker at Sotheby's International Realty.

56. The Valuation provides that, as of around May 25, 2016, the Real Property had an estimated selling price, as completed, of $21,000,000. *See* Exhibit D. The Real Property has since been completed.

**Legal Argument**

A. **Atlas is not Entitled to any Post-Petition Interest as Against the Debtor and the Atlas Claim is Satisfied in Full by Virtue of the Sale**

57. Pursuant to § 502(a) of the Bankruptcy Code, "a claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest objects." 11 U.S.C. § 502(a). "[I]f such objection to a claim is made, the court, after notice and a hearing … shall allow such claim in such amount except to the extent that … such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured…." 11 U.S.C. § 502(b)(1).

58. Pursuant to § 502(b)(2) of the Bankruptcy Code, an unsecured creditor is not entitled to assert a claim for interest that, as of the date of the commencement of the debtor's bankruptcy case, was unmatured. *See* 11 U.S.C. § 502(b)(2); *see also* Ogle v. Fid. & Deposit Co., 586 F.3d 143, 148 (2d Cir. 2009).

59. Moreover, in a bankruptcy case where the debtor is insolvent, an unsecured creditor is not entitled to back door the prohibition against payment of post-petition interest set forth in § 502(b)(2) by classifying payments from other obligors as payments of interest and, thus, classifying any remaining amounts asserted as owed as principal that can be asserted against the debtor. *See* Nat'l Energy & Gas Transmission, Inc. v. Liberty Elec. Power, LLC (In re Nat'l Energy & Gas Transmission, Inc.), 492 F.3d 297, 302-03 (4th Cir. 2007) ("A contrary result would permit Liberty, or any other creditor, to classify a payment on a debt from a non-debtor guarantor as non-principal, thus preserving the full value of the principal for collection in bankruptcy. If, for example, Liberty had classified GTN's payment of $140 million not as a payment on the debt but as consideration received in return for a covenant not to sue, we would certainly look behind the transaction and would not allow collection as principal of the full $140

16

million. We must likewise look behind Liberty's claim here to find that the claim really constitutes post-petition interest disguised as unpaid principal.").

    60.    As set forth succinctly in the concurrence to the <u>Liberty</u> decision:

> As I view it, the overarching issue in this appeal is reduced to this: does Liberty's contractual right with GTN, a third party, to allocate principal and interest, that is, to call payments from that guarantor what it wants to call them, preclude the Bankruptcy Court from calling those payments what they are vis-a-vis the bankrupt debtor. That is, can Liberty allocate its way around § 502(b)(2)'s disallowance of unmatured interest. In my view to do so is to simply call a rose by another name. Accordingly, I concur in the judgment.

<u>Liberty</u>, 492 F.3d at 303-04 (concurring in decision, but declining to join majority opinion's additional legal analysis of the issue that went beyond that stated in the occurrence).

    61.    Here, as of the Filing Date, Atlas has asserted that it was owed $13,681,526.79 (the "<u>Pre-Petition Principal and Interest</u>"), exclusive of attorneys' fees and costs. Pursuant to § 502(b)(2), as against the Debtor, Atlas' entitlement is limited to the Pre-Petition Principal and Interest and its reasonable costs and attorneys' fees, which Atlas has asserted, without substantiation, are, respectively, $75,942.89 and $377,497.03[7]. Accordingly, the maximum total amount that Atlas could assert as owing by the Debtor is $14,134,966.71 (the "<u>Maximum Atlas Claim</u>").

    62.    The Purchase Price to be received by Atlas on account of the Sale—$15,100,000—is in excess of the Maximum Atlas Claim that Atlas can assert against the Debtor.

---

[7] The Debtor does not concede that the expenses and attorneys' fees asserted by Atlas are correct or reasonable and expressly reserves the right to object to such amounts, if such an objection becomes warranted.

17

Accordingly, the Atlas Claim, as against the Debtor, is satisfied in full and the Atlas Claim should be disallowed, in its entirety.[8]

63. Atlas, by the Atlas Claim and Atlas Objection to Estimation, seeks to apply any proceeds of the Real Property that Atlas receives to interest before principal, which, assuming, *arguendo*, Atlas' calculation in the Atlas Claim is correct, would leave an outstanding principal balance that Atlas argues could be asserted against the Debtor. Atlas' attempt to circumvent § 502(b)(2) is exactly the strategy addressed and rejected in Liberty. Liberty, 492 F.3d at 302-04. Moreover, Atlas' attempt to improperly allocate its way around the clear language and intent of § 502(b)(2) would severely prejudice the other unsecured creditors, whose distributions would be thereby unfairly reduced. *See* Liberty, 492 F.3d at 302-03.

64. Accordingly, in light of the fact that Atlas has already been, or will soon be, paid more than it is entitled to collect from the Debtor, the Atlas Claim should be disallowed in its entirety.

> **B. In the Alternative, the Atlas Claim Should be Disallowed Because the Actual Fair Market Value of the Real Property Exceeds the Amount Asserted in the Atlas Claim**

65. Assuming, *arguendo*, that Atlas is entitled to indirectly assert any post-petition interest against the Debtor, Atlas is nonetheless not entitled to any claim against the Debtor's estate because Atlas is only entitled to assert a deficiency claim against the Debtor's estate and the fair market value of the Real Property exceeds the amounts Atlas claims it is owed.

66. Pursuant to New York law, where a party holding a note and mortgage elects to pursue the equitable remedy of foreclosure on the subject real property rather than suing to

---

[8] The Debtor takes no position with respect to whether Atlas can proceed against any other obligor to collect the remaining, post-petition interest and does not seek any relief with respect to Atlas' rights against any other parties.

enforce the note, such election of remedy is binding on the mortgagee and the mortgagee is not permitted to seek enforcement of the note, including against guarantors, except as a deficiency judgment in the foreclosure proceeding, unless the mortgagee obtains leave of the court in which the foreclosure in pending. *See generally* Mfrs. Hanover Tr. Co. v. 400 Garden City Assocs., 150 Misc. 2d 247, 249-50 (Sup. Ct. 1991).

67. Pursuant to New York law, a deficiency in a foreclosure case is calculated based on the difference between the debt and the actual, market value of the subject property, as determined by the state court, rather than the difference between the debt and the sales price. *See* N.Y. R.P.A.P.L. § 1371(2).

68. Here, Atlas elected its remedy pre-petition when it commenced the Foreclosure Action, in which it sought a judgment of foreclosure and sale and, if the sale resulted in a shortfall, a deficiency judgment against, *inter alia*, the Debtor. In fact, Atlas has reinforced its election of remedies to seek foreclosure and sale by proceeding with the Sale.

69. The amount of Atlas' security interest in the Real Property is currently being disputed in the Foreclosure Action. However, at best, Atlas' secured claim against the Real Property is the Atlas Asserted Claim Amount of $18,465,333.71.

70. However, the fair market value of the Real Property is in excess of the Atlas Asserted Claim Amount. *See* Exhibits D and E.

71. Accordingly, notwithstanding that the Purchase Price is less than the Atlas Asserted Claim Amount, for the purposes of calculating any deficiency claim, the market value will be controlling and Atlas will not be entitled to any deficiency claim. Thus, Atlas will not be entitled to assert any claim against the Debtor's estate and the Atlas Claim should be disallowed. *See* N.Y. R.P.A.P.L. § 1371(2).

72. In the interests of judicial economy, because a decision with respect to this alternative relief will only be necessary if the Court enters an adverse ruling against the Debtor with respect to her argument in chief, and because this alternative relief will require an evidentiary hearing that will be obviated by a ruling in favor of the Debtor on her argument in chief, the Debtor respectfully requests that the Court hold the alternative relief in abeyance pending a decision on the Debtor's arguments raised above.[9]

**WHEREFORE**, the Debtor respectfully requests the entry of an Order(s), substantially in the form annexed hereto disallowing the Atlas Claim against the Debtor's estate in its entirety, and for such other and further relief as is just and proper.

Dated: September 23, 2019
Wantagh, New York

**LaMONICA HERBST & MANISCALCO, LLP**
Special Counsel to the Debtor and Debtor-in-Possession

By: *s/ Joseph S. Maniscalco*
Joseph S. Maniscalco, Esq.
Jordan D. Weiss, Esq.
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: (516) 826-6500

---

[9] The Debtor expressly reserves the right to supplement the factual record with additional valuations of the Real Property if the Court determines to hold an evidentiary hearing on the Debtor's requested alternative relief.